## ABRAMS ET AL. *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 316. Argued October 21, 22, 1919.—Decided November 10, 1919.

Evidence sufficient to sustain any one of several counts of an indictment will sustain a verdict and judgment of guilty under all, if the sentence does not exceed that which might lawfully have been imposed under any single count. P. 619.

Evidence *held* sufficient to sustain a conviction of conspiracy to violate the Espionage Act by uttering, etc., circulars intended to provoke and encourage resistance to the United States in the war with Germany, and by inciting and advocating, through such circulars, resort to a general strike of workers in ammunition factories for the purpose of curtailing production of ordnance and munitions essential to the prosecution of the war. P. 619, *et seq.*

When prosecuted under the Espionage Act, persons who sought to effectuate a plan of action which necessarily, before it could be realized, involved the defeat of the plans of the United States for the conduct of the war with Germany, must be held to have intended that result notwithstanding their ultimate purpose may have been to prevent interference with the Russian Revolution. P. 621.

Affirmed.

THE case is stated in the opinion.

*Mr. Harry Weinberger* for plaintiffs in error.

*Mr. Assistant Attorney General Stewart*, with whom *Mr. W. C. Herron* was on the brief, for the United States.

MR. JUSTICE CLARKE delivered the opinion of the court.

On a single indictment, containing four counts, the five plaintiffs in error, hereinafter designated the defendants, were convicted of conspiring to violate provisions of the

Espionage Act of Congress (§ 3, Title I, of Act approved June 15, 1917, as amended May 16, 1918, 40 Stat. 553).

Each of the first three counts charged the defendants with conspiring, when the United States was at war with the Imperial Government of Germany, to unlawfully utter, print, write and publish: In the first count, "disloyal, scurrilous and abusive language about the form of Government of the United States;" in the second count, language "intended to bring the form of Government of the United States into contempt, scorn, contumely and disrepute;" and in the third count, language "intended to incite, provoke and encourage resistance to the United States in said war." The charge in the fourth count was that the defendants conspired "when the United States was at war with the Imperial German Government, . . . unlawfully and wilfully, by utterance, writing, printing and publication, to urge, incite and advocate curtailment of production of things and products, to wit, ordnance and ammunition, necessary and essential to the prosecution of the war." The offenses were charged in the language of the act of Congress.

It was charged in each count of the indictment that it was a part of the conspiracy that the defendants would attempt to accomplish their unlawful purpose by printing, writing and distributing in the City of New York many copies of a leaflet or circular, printed in the English language, and of another printed in the Yiddish language, copies of which, properly identified, were attached to the indictment.

All of the five defendants were born in Russia. They were intelligent, had considerable schooling, and at the time they were arrested they had lived in the United States terms varying from five to ten years, but none of them had applied for naturalization. Four of them testified as witnesses in their own behalf and of these, three frankly avowed that they were "rebels," "revolution-

ists," "anarchists," that they did not believe in government in any form, and they declared that they had no interest whatever in the Government of the United States. The fourth defendant testified that he was a "socialist" and believed in "a proper kind of government, not capitalistic," but in his classification the Government of the United States was "capitalistic."

It was admitted on the trial that the defendants had united to print and distribute the described circulars and that five thousand of them had been printed and distributed about the 22d day of August, 1918. The group had a meeting place in New York City, in rooms rented by defendant Abrams, under an assumed name, and there the subject of printing the circulars was discussed about two weeks before the defendants were arrested. The defendant Abrams, although not a printer, on July 27, 1918, purchased the printing outfit with which the circulars were printed and installed it in a basement room where the work was done at night. The circulars were distributed some by throwing them from a window of a building where one of the defendants was employed and others secretly, in New York City.

The defendants pleaded "not guilty," and the case of the Government consisted in showing the facts we have stated, and in introducing in evidence copies of the two printed circulars attached to the indictment, a sheet entitled "Revolutionists Unite for Action," written by the defendant Lipman, and found on him when he was arrested, and another paper, found at the headquarters of the group, and for which Abrams assumed responsibility.

Thus the conspiracy and the doing of the overt acts charged were largely admitted and were fully established.

On the record thus described it is argued, somewhat faintly, that the acts charged against the defendants were not unlawful because within the protection of that freedom

of speech and of the press which is guaranteed by the First Amendment to the Constitution of the United States, and that the entire Espionage Act is unconstitutional because in conflict with that Amendment.

This contention is sufficiently discussed and is definitely negatived in *Schenck* v. *United States* and *Baer* v. *United States,* 249 U. S. 47; and in *Frohwerk* v. *United States,* 249 U. S. 204.

The claim chiefly elaborated upon by the defendants in the oral argument and in their brief is that there is no substantial evidence in the record to support the judgment upon the verdict of guilty and that the motion of the dedendants for an instructed verdict in their favor was erroneously denied. A question of law is thus presented, which calls for an examination of the record, not for the purpose of weighing conflicting testimony, but only to determine whether there was some evidence, competent and substantial, before the jury, fairly tending to sustain the verdict. *Troxell* v. *Delaware, Lackawanna & Western R. R. Co.,* 227 U. S. 434, 442; *Lancaster* v. *Collins,* 115 U. S. 222, 225; *Chicago & Northwestern Ry. Co.* v. *Ohle,* 117 U. S. 123, 129. We shall not need to consider the sufficiency, under the rule just stated, of the evidence introduced as to all of the counts of the indictment, for, since the sentence imposed did not exceed that which might lawfully have been imposed under any single count, the judgment upon the verdict of the jury must be affirmed if the evidence is sufficient to sustain any one of the counts. *Evans* v. *United States,* 153 U. S. 608; *Claassen* v. *United States,* 142 U. S. 140; *Debs* v. *United States,* 249 U. S. 211, 216.

The first of the two articles attached to the indictment is conspicuously headed, "The Hypocrisy of the United States and her Allies." After denouncing President Wilson as a hypocrite and a coward because troops were sent into Russia, it proceeds to assail our Government in general, saying:

"His [the President's] shameful, cowardly silence about the intervention in Russia reveals the hypocrisy of the plutocratic gang in Washington and vicinity."

It continues:

"He [the President] is too much of a coward to come out openly and say: 'We capitalistic nations cannot afford to have a proletarian republic in Russia.'"

Among the capitalistic nations Abrams testified the United States was included.

Growing more inflammatory as it proceeds, the circular culminates in:

"The Russian Revolution cries: Workers of the World! Awake! Rise! Put down your enemy and mine!

"Yes! friends, there is only one enemy of the workers of the world and that is CAPITALISM."

This is clearly an appeal to the "workers" of this country to arise and put down by force the Government of the United States which they characterize as their "hypocritical," "cowardly" and "capitalistic" enemy.

It concludes:

"Awake! Awake, you Workers of the World!

"REVOLUTIONISTS."

The second of the articles was printed in the Yiddish language and in the translation is headed, "Workers— Wake up." After referring to "his Majesty, Mr. Wilson, and the rest of the gang; dogs of all colors!", it continues:

"Workers, Russian emigrants, you who had the least belief in the honesty of *our* Government," which defendants admitted referred to the United States Government, "must now throw away all confidence, must spit in the face the false, hypocritic, military propaganda which has fooled you so relentlessly, calling forth your sympathy, your help, to the prosecution of the war."

The purpose of this obviously was to persuade the persons to whom it was addressed to turn a deaf ear to patri-

otic appeals in behalf of the Government of the United
States, and to cease to render it assistance in the prosecu-
tion of the war.

It goes on:

"With the money which you have loaned, or are going
to loan them, they will make bullets not only for the Ger-
mans, but also for the Workers Soviets of Russia. · *Work-
ers in the ammunition factories, you are producing bullets,
bayonets, cannon, to murder not only the Germans, but also
your dearest, best, who are in Russia and are fighting for
freedom.*"

It will not do to say, as is now argued, that the only
intent of these defendants was to prevent injury to the
Russian cause. Men must be held to have intended, and
to be accountable for, the effects which their acts were
likely to produce. Even if their primary purpose and in-
tent was to aid the cause of the Russian Revolution, the
plan of action which they adopted necessarily involved,
before it could be realized, defeat of the war program of
the United States, for the obvious effect of this appeal, if
it should become effective, as they hoped it might, would
be to persuade persons of character such as those whom
they regarded themselves as addressing, not to aid govern-
ment loans and not to work in ammunition factories, where
their work would produce "bullets, bayonets, cannon"
and other munitions of war, the use of which would cause
the "murder" of Germans and Russians.

Again, the spirit becomes more bitter as it proceeds to
declare that —

"America and her Allies have betrayed (the Workers).
Their robberish aims are clear to all men. The destruc-
tion of the Russian Revolution, that is the politics of the
march to Russia.

"*Workers, our reply to the barbaric intervention has to be a
general strike! An open challenge* only will let the Govern-
ment know that not only the Russian Worker fights for

freedom, but also *here in America lives the spirit of Revolution.*"

This is not an attempt to bring about a change of administration by candid discussion, for no matter what may have incited the outbreak on the part of the defendant anarchists, the manifest purpose of such a publication was to create an attempt to defeat the war plans of the Government of the United States, by bringing upon the country the paralysis of a general strike, thereby arresting the production of all munitions and other things essential to the conduct of the war.

This purpose is emphasized in the next paragraph, which reads:

"Do not let the Government scare you with their wild punishment in prisons, hanging and shooting. We must not and will not betray the splendid fighters of Russia. *Workers, up to fight.*"

After more of the same kind, the circular concludes:

"Woe unto those who will be in the way of progress. Let solidarity live!"

It is signed, "The Rebels."

That the interpretation we have put upon these articles, circulated in the greatest port of our land, from which great numbers of soldiers were at the time taking ship daily, and in which great quantities of war supplies of every kind were at the time being manufactured for transportation overseas, is not only the fair interpretation of them, but that it is the meaning which their authors consciously intended should be conveyed by them to others is further shown by the additional writings found in the meeting place of the defendant group and on the person of one of them. One of these circulars is headed: "Revolutionists! Unite for Action!"

After denouncing the President as "Our Kaiser" and the hypocrisy of the United States and her Allies, this article concludes:

"Socialists, Anarchists, Industrial Workers of the World, Socialists, Labor party men and other revolutionary organizations *Unite for action* and let us save the Workers' Republic of Russia!

"*Know you lovers of freedom that in order to save the Russian revolution, we must keep the armies of the allied countries busy at home.*"

Thus was again avowed the purpose to throw the country into a state of revolution if possible and to thereby frustrate the military program of the Government.

The remaining article, after denouncing the President for what is characterized as hostility to the Russian revolution, continues:

"We, the toilers of America, who believe in real liberty, shall *pledge ourselves*, in case the United States will participate in that bloody conspiracy against Russia, *to create so great a disturbance that the autocrats of America shall be compelled to keep their armies at home, and not be able to spare any for Russia.*"

It concludes with this definite threat of armed rebellion:

"If they will use arms against the Russian people to enforce their standard of order, *so will we use arms*, and they shall never see the ruin of the Russian Revolution."

These excerpts sufficiently show, that while the immediate occasion for this particular outbreak of lawlessness, on the part of the defendant alien anarchists, may have been resentment caused by our Government sending troops into Russia as a strategic operation against the Germans on the eastern battle front, yet the plain purpose of their propaganda was to excite, at the supreme crisis of the war, disaffection, sedition, riots, and, as they hoped, revolution, in this country for the purpose of embarrassing and if possible defeating the military plans of the Government in Europe. A technical distinction may perhaps be taken between disloyal and abusive language applied to the *form* of our government or language intended to bring the *form*

of our government into contempt and disrepute, and language of like character and intended to produce like results directed against the President and Congress, the agencies through which that form of government must function in time of war. But it is not necessary to a decision of this case to consider whether such distinction is vital or merely formal, for the language of these circulars was obviously intended to provoke and to encourage resistance to the United States in the war, as the third count runs, and, the defendants, in terms, plainly urged and advocated a resort to a general strike of workers in ammunition factories for the purpose of curtailing the production of ordnance and munitions necessary and essential to the prosecution of the war as is charged in the fourth count. Thus it is clear not only that some evidence but that much persuasive evidence was before the jury tending to prove that the defendants were guilty as charged in both the third and fourth counts of the indictment and under the long established rule of law hereinbefore stated the judgment of the District Court must be

*Affirmed.*

Mr. Justice Holmes dissenting.

This indictment is founded wholly upon the publication of two leaflets which I shall describe in a moment. The first count charges a conspiracy pending the war with Germany to publish abusive language about the form of government of the United States, laying the preparation and publishing of the first leaflet as overt acts. The second count charges a conspiracy pending the war to publish language intended to bring the form of government into contempt, laying the preparation and publishing of the two leaflets as overt acts. The third count alleges a conspiracy to encourage resistance to the United States in the same war and to attempt to effectuate the purpose by publishing the same leaflets. The fourth count lays a con-

spiracy to incite curtailment of production of things necessary to the prosecution of the war and to attempt to accomplish it by publishing the second leaflet to which I have referred.

The first of these leaflets says that the President's cowardly silence about the intervention in Russia reveals the hypocrisy of the plutocratic gang in Washington. It intimates that "German militarism combined with allied capitalism to crush the Russian revolution"—goes on that the tyrants of the world fight each other until they see a common enemy—working class enlightenment, when they combine to crush it; and that now militarism and capitalism combined, though not openly, to crush the Russian revolution. It says that there is only one enemy of the workers of the world and that is capitalism; that it is a crime for workers of America, &c., to fight the workers' republic of Russia, and ends "Awake! Awake, you Workers of the World! Revolutionists." A note adds "It is absurd to call us pro-German. We hate and despise German militarism more than do you hypocritical tyrants. We have more reasons for denouncing German militarism than has the coward of the White House."

The other leaflet, headed "Workers—Wake Up," with abusive language says that America together with the Allies will march for Russia to help the Czecko-Slovaks in their struggle against the Bolsheviki, and that this time the hypocrites shall not fool the Russian emigrants and friends of Russia in America. It tells the Russian emigrants that they now must spit in the face of the false military propaganda by which their sympathy and help to the prosecution of the war have been called forth and says that with the money they have lent or are going to lend "they will make bullets not only for the Germans but also for the Workers Soviets of Russia," and further, "Workers in the ammunition factories, you are producing bullets, bayonets, cannon, to murder not only the Ger-

mans, but also your dearest, best, who are in Russia and are fighting for freedom." It then appeals to the same Russian emigrants at some length not to consent to the "inquisitionary expedition to Russia," and says that the destruction of the Russian revolution is "the politics of the march to Russia." The leaflet winds up by saying "Workers, our reply to this barbaric intervention has to be a general strike!," and after a few words on the spirit of revolution, exhortations not to be afraid, and some usual tall talk ends "Woe unto those who will be in the way of progress. Let solidarity live! The Rebels."

No argument seems to me necessary to show that these pronunciamentos in no way attack the form of government of the United States, or that they do not support either of the first two counts. What little I have to say about the third count may be postponed until I have considered the fourth. With regard to that it seems too plain to be denied that the suggestion to workers in the ammunition factories that they are producing bullets to murder their dearest, and the further advocacy of a general strike, both in the second leaflet, do urge curtailment of production of things necessary to the prosecution of the war within the meaning of the Act of May 16, 1918, c. 75, 40 Stat. 553, amending § 3 of the earlier Act of 1917. But to make the conduct criminal that statute requires that it should be "with intent by such curtailment to cripple or hinder the United States in the prosecution of the war." It seems to me that no such intent is proved.

I am aware of course that the word intent as vaguely used in ordinary legal discussion means no more than knowledge at the time of the act that the consequences said to be intended will ensue. Even less than that will satisfy the general principle of civil and criminal liability. A man may have to pay damages, may be sent to prison, at common law might be hanged, if at the time of his act

616.                    HOLMES, J., dissenting.

he knew facts from which common experience showed that the consequences would follow, whether he individually could foresee them or not. But, when words are used exactly, a deed is not done with intent to produce a consequence unless that consequence is the aim of the deed. It may be obvious, and obvious to the actor, that the consequence will follow, and he may be liable for it even if he regrets it, but he does not do the act with intent to produce it unless the aim to produce it is the proximate motive of the specific act, although there may be some deeper motive behind.

It seems to me that this statute must be taken to use its words in a strict and accurate sense. They would be absurd in any other. A patriot might think that we were wasting money on aeroplanes, or making more cannon of a certain kind than we needed, and might advocate curtailment with success, yet even if it turned out that the curtailment hindered and was thought by other minds to have been obviously likely to hinder the United States in the prosecution of the war, no one would hold such conduct a crime. I admit that my illustration does not answer all that might be said but it is enough to show what I think and to let me pass to a more important aspect of the case. I refer to the First Amendment to the Constitution that Congress shall make no law abridging the freedom of speech.

I never have seen any reason to doubt that the questions of law that alone were before this Court in the cases of *Schenck, Frohwerk* and *Debs,* 249 U. S. 47, 204, 211, were rightly decided. I do not doubt for a moment that by the same reasoning that would justify punishing persuasion to murder, the United States constitutionally may punish speech that produces or is intended to produce a clear and imminent danger that it will bring about forthwith certain substantive evils that the United States constitutionally may seek to prevent. The power undoubtedly is

greater in time of war than in time of peace because war opens dangers that do not exist at other times. ,

But as against dangers peculiar to war, as against others, the principle of the right to free speech is always the same. It is only the present danger of immediate evil or an intent to bring it about that warrants Congress in setting a limit to the expression of opinion where private rights are not concerned. Congress certainly cannot forbid all effort to change the mind of the country. Now nobody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so. Publishing those opinions for the very purpose of obstructing however, might indicate a greater danger and at any rate would have the quality of an attempt. So I assume that the second leaflet if published for the purposes alleged in the fourth count might be punishable. But it seems pretty clear to me that nothing less than that would bring these papers within the scope of this law. An actual intent in the sense that I have explained is necessary to constitute an attempt, where a further act of the same individual is required to complete the substantive crime, for reasons given in *Swift & Co. v. United States,* 196 U. S. 375, 396. It is necessary where the success of the attempt depends upon others because if that intent is not present the actor's aim may be accomplished without bringing about the evils sought to be checked. An intent to prevent interference with the revolution in Russia might have been satisfied without any hindrance to carrying on the war in which we were engaged.

I do not see how anyone can find the intent required by the statute in any of the defendants' words. The second leaflet is the only one that affords even a foundation for the charge, and there, without invoking the hatred of German militarism expressed in the former one, it is evi-

dent from the beginning to the end that the only object of the paper is to help Russia and stop American intervention there against the popular government—not to impede the United States in the war that it was carrying on. To say that two phrases taken literally might import a suggestion of conduct that would have interference with the war as an indirect and probably undesired effect seems to me by no means enough to show an attempt to produce that effect.

I return for a moment to the third count. That charges an intent to provoke resistance to the United States in its war with Germany. Taking the clause in the statute that deals with that in connection with the other elaborate provisions of the act, I think that resistance to the United States means some forcible act of opposition to some proceeding of the United States in pursuance of the war. I think the intent must be the specific intent that I have described and for the reasons that I have given I think that no such intent was proved or existed in fact. I also think that there is no hint at resistance to the United States as I construe the phrase.

In this case sentences of twenty years imprisonment have been imposed for the publishing of two leaflets that I believe the defendants had as much right to publish as the Government has to publish the Constitution of the United States now vainly invoked by them. Even if I am technically wrong and enough can be squeezed from these poor and puny anonymities to turn the color of legal litmus paper; I will add, even if what I think the necessary intent were shown; the most nominal punishment seems to me all that possibly could be inflicted, unless the defendants are to be made to suffer not for what the indictment alleges but for the creed that they avow—a creed that I believe to be the creed of ignorance and immaturity when honestly held, as I see no reason to doubt that it was held here, but which, although made the subject of examination at the

trial, no one has a right even to consider in dealing with the charges before the Court.

Persecution for the expression of opinions seems to me perfectly logical. If you have no doubt of your premises or your power and want a certain result with all your heart you naturally express your wishes in law and sweep away all opposition. To allow opposition by speech seems to indicate that you think the speech impotent, as when a man says that he has squared the circle, or that you do not care whole-heartedly for the result, or that you doubt either your power or your premises. But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country. I wholly disagree with the argument of the Government that the First Amendment left the common law as to seditious libel in force. History seems to me against the notion. I had conceived that the United States through many years had shown its repentance for the Sedition Act of 1798, by repaying fines that it imposed. Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrants

making any exception to the sweeping command, "Congress shall make no law . . . . abridging the freedom of speech." Of course I am speaking only of expressions of opinion and exhortations, which were all that were uttered here, but I regret that I cannot put into more impressive words my belief that in their conviction upon this indictment the defendants were deprived of their rights under the Constitution of the United States.

MR. JUSTICE BRANDEIS concurs with the foregoing opinion.