## DE KAY v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. April 20, 1922.)

No. 1493.

**1. Criminal law ⬉1177—Where sentences are concurrent judgment is sustained by evidence warranting conviction on any count.**

A judgment of conviction under which sentences imposed on different counts run concurrently, and no sentence exceeds the maximum penalty under any one count, is sustained by evidence which warranted conviction on any count.

**2. Banks and banking ⬉257(3)—Evidence held to sustain conviction for aiding in misapplying funds of national bank.**

Evidence that defendant caused fictitious drafts to be drawn and sent to the president of a national bank, who in accordance with an understanding between them caused the drafts to be credited at once, before collection or acceptance, to accounts of which defendant, or a corporation in which both were interested, had the benefit, the drafts on maturity being taken up by means of others, the purpose being to obtain loans from the bank without approval by the directors, and with the final result that the bank was illegally subjected to the risk of loss, *held* to sustain a conviction under Rev. St. § 5209 (Comp. St. § 9772), for aiding and abetting the president in misapplying funds of the bank.

**3. Pardon ⬉11—Amnesty proclamation held not to apply to a defendant, whose sentence had been deferred awaiting settlement of bill of exceptions.**

The President's proclamation of June 14, 1917, granting amnesty and pardon to all persons under suspended sentences of United States courts and to all defendants "in cases where pleas of guilty were entered, or verdicts of guilty returned, prior to June 15, 1916, and in which no sentences have been imposed," included in the second class only defendants on whom the court had purposely refrained from imposing sentence as an act of grace, in accordance with a prevailing, but illegal, practice, and did not apply to a defendant against whom a verdict of guilty had been returned, but who had not yet been sentenced, because the case was still in course of adjudication, and in accordance with the practice in the district imposition of sentence was awaiting settlement of a bill of exceptions.

In Error to the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Criminal prosecution by the United States against Henry E. De Kay. Judgment of conviction, and defendant brings error. Affirmed.

For opinion below, see United States v. Metcalf, 257 Fed. 184.

Henry M. Boss, Jr., of Providence, R. I. (Thomas Z. Lee and Patrick H. Quinn, both of Providence, R. I., on the brief), for plaintiff in error.

George H. Huddy, Jr., Sp. Asst. Atty. Gen., for the United States.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. Edward P. Metcalf, the president of the Atlantic National Bank of Providence, R. I., the plaintiff in error, and John W. De Kay were jointly indicted in the District Court of the United States for the District of Rhode Island upon three indictments, in which Metcalf was charged with misapplying the funds

of the bank in violation of section 5209, R. S. (Comp. Stat. § 9772), and the two De Kays with having aided and abetted him. John W. De Kay was not within the jurisdiction of the court. These indictments were joined, and Metcalf and the plaintiff in error, who will be hereinafter referred to as the defendant, were tried together. Both were convicted; Metcalf upon all ten counts in all the indictments submitted to the jury and Henry E. De Kay upon all except one count in one indictment.

The misapplication charged was the withdrawal of the money of the bank upon nine drafts, six drawn by one B. M. Riker upon the Mexican National Packing Company, and three by the Massachusetts Chemical Company upon John W. De Kay, when neither the Mexican National Packing Company nor John W. De Kay were indebted to the drawer, and when both Metcalf and the defendant knew them to be worthless, and intended only as a device to obtain money from the bank. The drafts drawn upon the Mexican National· Packing Company are designated by counsel as "Mexpac" drafts, and those drawn by the Chemical Company as "Chemical" drafts, and they will be so designated herein.

Five of the "Mexpac" drafts and the three "Chemical" drafts were, by direction of Metcalf, credited to his account at the bank before they had been accepted, or the amount for which they had been drawn collected, and their amounts were afterwards withdrawn by checks of the said Metcalf and paid over to the defendant or his brother, John W. De Kay, or the Mexican National Packing Company, Limited. The other "Mexpac" draft was credited to the account of John W. De Kay at the bank and this amount was withdrawn from the bank by the defendant, who had a power of attorney to draw upon his brother's account.

The jury was fully and carefully instructed upon all the essential elements of the offense set out in the statute, and no error is assigned, either to the instructions given or to the admission or exclusion of testimony.

The only questions raised by the assignment of errors which have been argued are:

First. Whether there was any substantial evidence to sustain the verdict.

Second. Whether Henry E. De Kay is entitled to the benefit of the grant of amnesty and pardon contained in the President's proclamation hereinafter discussed.

The determination of the first question calls for a careful examination of the record.

The defendant and his brother, John W. De Kay, were interested in the reorganization of the Mexican National Packing Company, which had been engaged in the packing business in Mexico. The defendant had been appointed receiver of the company, which had got into financial difficulties, and with his brother, John W. De Kay, had formed a new corporation known as the Mexican National Packing Company, Limited, which had taken over all the assets of the old company, and the De Kays were attempting to finance the new company.

Henry E. De Kay had an office in New York City. John W. De Kay was attempting in London to float the sale of the bonds of the new company, and another brother, Louis, acted as superintendent and manager of the company in Mexico.

E. P. Metcalf, since 1902, had been the president of the Atlantic National Bank. In 1909, as the guest of John W. De Kay, he made a trip to Mexico and as a result of this trip and his examination of the property of the Mexican National Packing Company, he purchased for the bank a draft for £5,000 sterling, drawn by that company upon the British & Mexican Trust Company of London, which was not paid, but afterward put into the form of a note made by a clerk of the De Kays named Moyer, and this note was unpaid when the bank closed. Because of this transaction the directors of the bank were opposed to taking any more obligations of the De Kays, or in which they were interested, and Metcalf knew this. He, however, interested himself in the reorganization of the Packing Company, and admitted that, for his services in assisting the De Kays in financing the new company, he was to receive the sum of $25,000 and also a block of its stock. Through his own holdings, and those of others which he managed, he controlled a majority of the stock of the Atlantic National Bank. Outside of his indebtedness, he estimated, at the time of the transactions covered by the indictments, that he was worth $50,000; that his income was $15,000 per year, $9,000 being derived from his salaries as president of the bank and as an officer of two corporations, and $6,000 as dividends upon stock owned by him. The bank was closed on April 14, 1913, and a receiver appointed.

[1] The sentences imposed by the court upon all the counts of all the indictments were to be served concurrently, and in no case exceeded the maximum penalty provided by the statute, so that, if there was any substantial evidence to sustain the verdict against the defendant upon any count, it must stand. Abrams v. United States, 250 U. S. 616, 40 Sup. Ct. 17, 63 L. Ed. 1173.

[2] These "Mexpac" drafts were signed by one B. M. Riker, who was a stenographer in the office of the defendant. The name of the drawee was left blank, as well as the date and amount of each draft, and all were sent, by direction of the defendant, to Metcalf to use as he saw fit. They were made payable five to ten days after sight at a bank in the city of Mexico and all but one were credited, by order of Metcalf, to his account at the bank before their acceptance or collection. One was credited to the account of John W. De Kay at the bank, upon which the defendant was authorized to draw. Metcalf then, with checks upon this account, obtained cashier's checks, which were sent to the defendant in New York, or he caused the account of John W. De-Kay at the bank to be credited with them. Many "Mexpac" drafts had been used at the bank in a similar manner by Metcalf before the use of these six, and the defendant, from his New York office, had kept Metcalf informed as to the dates of maturity of these drafts and sums necessary to cover them.

The Chemical Company drafts were drawn, by direction of the defendant at the request of Metcalf, upon John W. De Kay, payable in

London, and were credited to the account of Metcalf at the bank, by his direction, and cashier's checks for approximately their amounts were sent to John W. De Kay.

There was evidence that Metcalf knew that all the drafts were fictitious, and that he was told, both by Henry E. De Kay and his brother, that there were no funds to meet them when they were drawn, and that it would be necessary for him to supply funds at their maturity.

The defendant admitted that the purpose of using both the "Mexpac" and "Chemical Company" drafts was to borrow money; and there was evidence from which the jury could find that it was to be borrowed from the bank by the use of fictitious paper, which did not have to meet the approval of its directors, as loans. These drafts were not indorsed by any one and were not secured by any collateral, and the result was that money was withdrawn from the bank for the benefit of the defendant or his brother or the Mexican National Packing Company, Limited, without any security, and the bank subjected to the risk of loss, and that in any event it would lose the interest upon a considerable sum of money for the time that would necessarily elapse before the drafts became due.

It is admitted by counsel that, if Henry E. De Kay caused these drafts to be furnished to Metcalf with the knowledge that he intended to make an unlawful use of them by the misapplication of the funds of the bank, he was guilty of aiding and abetting, as charged in the indictment. It is contended, however, that he had no knowledge of the unlawful use of these drafts and that he and his brother both supposed that the money they received from Metcalf was loaned by him personally, and that their indebtedness was to him, and not to the bank.

It must have been apparent to the jury that Edward P. Metcalf was applied to and offered a large return to assist in promoting the reorganization of the Mexican Company in which they were interested, not because of his personal financial strength, but because of his control, as president, of the funds and credits of the bank.

The defendant admitted that the drafts which were placed in the hands of E. P. Metcalf were intended to be used by Metcalf in borrowing money for his personal use and that of his brother and of the company.

The following excerpts from letters of the defendant to Metcalf show that he was requesting him to use "Mexpac" drafts and that he knew that there were no funds to meet them:

"You understand, of course, that the funds to take up these drafts and checks are not available at this time."

One of the drafts referred to is one of the "Mexpac" drafts covered by one of the counts in one of the indictments.

"While you were in the West it was necessary for me to give my check on the Atlantic National Bank for $1,000, this check being sent to London to take care of a matter there; and I presume it will be in on Saturday of this week or Monday of next week, and I wish you would be good enough, when this check comes in, to use the inclosed draft on Mexpac for $2,000, drawn at five days' sight on the Mexico City office, and place the proceeds to my credit, so that the check may be protected and my account not be in the red,

and I expect, by the time this draft will have become payable, to be in funds to cover it. When it is used, if you will be good enough to advise me, I will write my brother Louis to accept it, and to cable me its maturing date, so that it may be taken care of in due course."

"Inclose you herewith copy of cable received from Mexico. The draft referred to is 2,900 pesos and is due on the 23d. I wish, if you can possibly see your way to do so, that you would use a Mexpac draft for this amount and send me the money, so that I may cable it to Mexico to take up this matter. I will in the meantime, before this draft matures, take the matter up with Louis and try and get him to pay it at maturity."

"As you have the paper which I sent you Friday, and will be able to discount it I believe, it will be all right, if necessary, for you to use Mexico or London draft to cover this amount."

"I know, of course, from my experience down there, that the things he has done have had to be paid for, and with the condition of business down there of course, he has not been in a position where paying for them would not cripple him. I wish there were some way whereby we could figure out to send him $1,500 gold to help him over the present situation. I do not know, however, if he would be able to repay the amount if you drew a draft on Mexico, 10 days' sight, for $1,500, but it seems to me that something ought to materialize in London between now and the time the draft would be due for that amount, provided you can see your way clear to draw it."

That the defendant knew there were no funds to meet the "Chemical" drafts when drawn is shown by his letter to Metcalf of March 6, 1913, in which he incloses copy of letter written by him to the Massachusetts Chemical Company at Metcalf's request, and adds:

"You and Mr. Baldwin of the Massachusetts Chemical Company, of course, understand that, unless John gets some funds out of the reorganization of Mexpac, he will be unable to take care of these drafts when they arrive in London; but we hope that the business will be so far along by the time they reach there that he will be able to meet them."

That there was evidence tending to show that the defendant knew that the bank was the medium through which Metcalf had used these drafts appears from the following extracts from letters and cables of Metcalf which passed through his hands:

"I have asked our bank to telegraph Mexico to extend drafts 34 and 35 for ten days."

"Regarding draft 49, $2,600, we have requested our bank to extend the draft ten days, and at the end of that time to accept payment of one-half and give a further extension of ten days on the balance."

On May 20, 1912, the defendant cabled to Louis De Kay in Mexico:

"Mr. Metcalf has wired Mexico bankers to extend all of the drafts which he drew on Mexico, with the exception of No. 36 for $900 gold, which is dated May 3d and due May 23d. It is held by the London Bank of Mexico and South America. I will cable you this money on the 23d of May."

In July, 1912, Metcalf, through the defendant, sent a cable to J. W. De Kay stating the indebtedness of the Mexican National Packing Company, Limited, to him personally was $60,000, and including in other indebtedness "Mexican drafts now outstanding $8,500."

Led on by the alluring prospects of success which were cabled from London by J. W. De Kay to H. E. De Kay, and of which Metcalf was kept fully informed, the latter had used his official position as president of the bank to assist the De Kays in their enterprise until, within the knowledge of the defendant, as appears from one of his letters to his

brother, Metcalf had become "badly tied up," and in another letter he writes of him as "badly pressed." In a letter of August 7, 1912, he quotes a statement from a letter of Metcalf to him that he "cannot hold out until September." Fully knowing Metcalf's financial condition, the defendant thereafter urged him to use these worthless drafts to secure funds for himself and his brother, and the company in which they were interested, holding out that, in case of success in placing the bonds of the company, all of the indebtedness of the company would be paid, and that Metcalf would receive his compensation of $25,000 and a large block of the stock of the company. He testified that Metcalf was to use these drafts as "he saw fit." He knew that the drafts were being perverted from their ordinary use to serve as instruments of credit upon which to obtain loans, and that, without waiting for their collection, their proceeds were at once received by him or credited to the account of his brother in the Atlantic National Bank, upon which he had authority to draw. He had asked to have the bank extend payment on some of them after they had reached Mexico. He knew that checks on the Atlantic National Bank in the form of New York exchange were usually employed to take up these drafts. There was abundant testimony that he knew and contemplated that when not only the drafts set out in the indictments, but many others, were used, the drawee did not have funds to meet them, and that they were not handled according to the usual course of business, but that the amounts for which they were drawn were credited to the account of John W. De Kay before the drafts were accepted, or the amounts for which they were drawn collected, and that the company was thereby obtaining the use of the money of the bank without the payment of interest, and that these drafts, when they matured, were not being paid, but, if payment was not extended, they were met by the use of like drafts.

One of the "Mexpac" drafts, dated December 7, 1912, signed by B. M. Riker and drawn for the sum of $1,200, was the instrument by which it was charged the misapplication was made in one of the indictments. This draft was credited as cash upon the account of John W. De Kay at the bank when presented by Metcalf.

As this account was subject to be drawn upon by check of the defendant through the power of attorney given him by his brother, it does not seem probable that he did not know of this credit, as the account had but a small amount of money in it before this credit was made, and only two days later was overdrawn by the sum of $72.60.

The trial of the case consumed 31 days and the record is voluminous, containing evidence of transactions extending over several years between the defendant and his brother uopn one side, and Metcalf on the other, in which worthless drafts, drawn, not only upon the Mexican Company, but also upon the brother in London, and the latter's worthless checks and those of other persons in London, were the means employed to supply funds for the indigent promoters of an enterprise in which the prospects of success were uncertain.

We think that the inferences which could be fairly and reasonably drawn from the proven and admitted facts furnish substantial evidence

that the defendant had knowledge of the unlawful methods practiced by Metcalf as president of the bank and are sufficient to sustain the verdict.

[3] The second question raised by the assignment of errors makes it necessary to examine the several steps that were taken in the case after a verdict was rendered and also the President's proclamation, upon which the defendant relies to support his contention that he was included within the grant of amnesty and pardon which it contains.

After the verdict of guilty the defendant applied for and obtained leave to file a bill of exceptions, and the time for presenting it was successively extended to April 23, 1915. On this date he filed a motion for a new trial, which was heard June 19, 1915, and overruled on September 29, 1915.

On November 12, 1915, a motion was filed by the United States for the assignment of the case for hearing upon the settlement and allowance of the defendant's bill of exceptions and the case was assigned for hearing on November 20, 1915. On that date the case was continued to November 27, 1915, and was thereafter continued from time to time because of the illness of counsel for the defendant to May 22, 1916, when the court ordered a continuance to the next regular term of all cases open and undisposed of on the docket at the close of the May term.

On May 27, 1917, the court ordered a continuance to the next regular term of all cases remaining open and undisposed of on the docket at the close of the November, 1916, term.

On June 14, 1917, the President promulgated a proclamation containing a grant of amnesty and pardon to certain defendants who had been convicted in federal courts, but upon whom sentence had not been imposed or carried into execution.

This proclamation followed the decision of the Supreme Court of the United States on December 4, 1916, in the case of Ex parte United States, Petitioner, 242 U. S. 27, 37 Sup. Ct. 72, 61 L. Ed. 129, L. R. A. 1917E, 1178, Ann. Cas. 1917B, 355, known as the "Killits" Case, in which it was held that an order indefinitely suspending the execution of a sentence of the defendant in a criminal case was illegal.

The proclamation was as follows:

"Whereas, a practice has existed for many years among the judges of certain United States courts of suspending either the imposition or the execution of sentences whenever, in their judgment, the circumstances warranted it, which practice is illegal as has been held by the Supreme Court of the United States in a case entitled 'Ex parte United States, petitioner,' known as the Killits Case, decided December 4, 1916; and

"Whereas, the practice was widespread, and many thousands of persons are now at liberty under such suspension, never having served any portion of the sentences duly authorized and required by the statutes; and

"Whereas, many of these persons are leading blameless lives and have reestablished themselves in the confidence of their fellow citizens, and it is believed that the enforcement of the law at this late date would, in most instances, be productive of no good result; and

"Whereas, the Supreme Court of the United States, in recognition of the necessity for meeting this situation, has stayed the mandate in the Killits Case, until the end of the present term, to wit, until about June 15, 1917:

"Now, therefore, be it known that I, Woodrow Wilson, President of the

United States of America, in consideration of the premises, divers other good and sufficient reasons me thereunto moving, do hereby declare and grant a full amnesty and pardon to all persons under suspended sentences of United States courts liable to penalties as aforesaid, where the sentences imposed were less than the period between the date of imposition and June 15, 1917, and to all persons, defendants in said courts, in cases where pleas of guilty were entered or verdicts of guilty returned prior to June 15, 1916, and in which no sentences have been imposed.

"In all other cases of suspension either of the imposition or the execution of sentence by judges of the United States courts occurring prior to December 4, 1916, the date of the decision in the Killits Case, a respite of six months is hereby granted from June 15, 1917, in order that the facts and merits of the respective cases may be investigated and considered and appropriate action taken, where warranted, by way of executive clemency.

"In testimony whereof, I have hereunto signed my name and caused the seal of the Department of Justice to be affixed.

"Done at the city of Washington this fourteenth day of June, in the year of our Lord one thousand nine hundred and seventeen, and of the Independence of the United States the one hundred and forty-first.

                                                    "Woodrow Wilson.
"By the President:
         T. W. Gregory, Attorney General."

On July 17, 1917, the defendant filed an alleged acceptance of the pardon and grant of amnesty, and on July 24, 1917, a plea in bar in arrest of judgment, because of the grant of amnesty and pardon extended by this proclamation.

To this plea the government filed a replication August 20, 1917, to which the defendant demurred. The demurrer and defendant's plea in arrest of judgment were overruled by the District Court in an opinion rendered April 2, 1919, to which defendant duly excepted.

A bill of exceptions was presented and allowed on February 6, 1920, and upon motion of the attorney for the United States the defendant was sentenced, upon each of the counts in the indictments upon which he had been convicted, for a term of five years, the terms of sentence upon all the counts in all the indictments to run concurrently.

In construing the proclamation of the President the same rule of construction must be applied as in the construction of statutes, and the whole proclamation must be considered to find the presidential intent.

In the preamble it clearly appears that the President's attention had been called to the decision of the Supreme Court in the "Killits" Case and that, in the proclamation, he intended to deal with a practice which—

"has existed for many years among the judges of certain United States courts of suspending either the imposition or the execution of sentences whenever, in their judgment, the circumstances warranted it."

The preamble states that the practice is widespread and many thousands of persons are now at liberty under such suspension; that such persons are "leading blameless lives," and "that the enforcement of the law at this late date would in most instances be productive of no good result"; that, "in recognition of the necessity for meeting this situation," the Supreme Court of the United States "has stayed the mandate in the 'Killits' Case until the end of the present term, to wit, until about June 15, 1917."

Then follows the grant of amnesty and pardon, which, read in the light of the preamble, makes it apparent that it was intended by the President to apply only to such defendants as fell into the class discussed in the preamble.

In the "Killits" Case the court dealt only with the defendants whose sentences had been indefinitely suspended. Taken in connection with the decision in that case, which had brought to the attention of the President that such practice was illegal, it is evident that the grant of pardon and amnesty, although stated in general terms to extend "to all persons, defendants in said courts, in cases where pleas of guilty were entered or verdicts of guilty returned prior to June 15, 1916, and in which no sentences have been imposed," must be restricted to the defendants whose sentences had been illegally suspended, and would not apply to a defendant who had been found guilty and upon whom sentence had not been imposed, not because of its suspension by a judicial act, but because the case was in process of adjudication.

Applying the same rule of construction as was applied in Church of the Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, it is apparent that, although the contention of the defendant that the pardon was extended to him by the grant of amnesty contained in the proclamation "may be within the letter of the statute," it is "not within its spirit."

The purpose and intent of the proclamation were made certain by a second proclamation of the President made upon August 21, 1917, in which it is stated:

"I, Woodrow Wilson, President of the United States of America, in order to avoid possible misunderstandings, do hereby proclaim, declare, and make known that the aforesaid proclamation, in purpose and intent, applied and does apply to the following cases, to wit:

"(1) Cases of defendants in United States courts, under suspended sentences. * * *

"(2) Cases of defendants in United States courts, not actually in process of adjudication on June 14, 1917 (the date of the aforesaid proclamation), wherein pleas of guilty were entered or verdicts of guilty were returned prior to June 15, 1916, and in which the imposition of sentence had been illegally suspended by the court or in which the court had illegally declined to impose sentence upon proper motion by the prosecuting attorney."

It was not the purpose of the second proclamation to make any change in the class of defendants to whom the grant of amnesty and pardon (contained in the first proclamation) was extended, but simply to explain and make certain the class of defendants to which it actually applied, and which did not include defendants in the United States courts whose cases were "actually in process of adjudication on June 14, 1917."

The entries upon the docket of the District Court in this case do not show any indefinite postponement of sentence or any suspension of the same, but show that the case was actually in process of adjudication, and that the District Court, in the exercise of reasonable discretion, was awaiting the presentation of a bill of exceptions before the imposition of sentence, in accordance with the practice in that district.

This appears from this statement in the opinion of the learned judge of the District Court:

"It has long been the practice in this district and circuit to defer sentence until after the settling of the bill of exceptions, in order that the record which is to be re-examined upon writ of error may be perfected before judgment thereon."

We are therefore compelled to hold that the defendant was not included in the pardon granted by the President's proclamation, and, having adversely disposed of all the questions raised by the assignment of errors which have been argued, the entry must be—

The judgment of the District Court is affirmed.