[No. 40096.    En Banc.    September 3, 1970.]

THE STATE OF WASHINGTON, *Respondent,* v. FLOYD WAYNE
TURNER, JR., *Appellant.**

*Philip L. Burton,* for appellant.

*Charles O. Carroll, Neal J. Shulman,* and *Gerald M. Lorentson,* for respondent.

HALE, J.—Found guilty by a jury of violating the Uniform Flag Law (Laws of 1919, ch. 107, p. 259; RCW 9.86), defendant appeals the sentence of 6 months in jail and a $500 fine.

The statute then in effect declared:

> No person shall publicly mutilate, deface, defile, defy, trample upon or by word or act cast contempt upon any such flag, standard, color, ensign or shield.

Uniform Flag Law, RCW 9.86.030.[1]

*Reported in 474 P.2d 91.

---

[1] In 1969, the legislature changed the flag law to read:
No person shall knowingly cast contempt upon any flag, stand-

The amended information charged that the defendant, on May 12, 1967:

did willfully and unlawfully and directly and indirectly aid, abet, assist, counsel, encourage, advise and induce another to publicly mutilate, deface, defile and defy a flag of the United States of America, and publicly, by word or act cast contempt upon said flag by doing the following acts, to-wit: *holding a flag of the United States of America while another set fire to and destroyed said flag by burning.*

(Italics ours.)

Defendant's arrest stemmed from a report to Seattle police by Mr. Louis C. Scott, a Seattle apartment house manager, who testified that about 6 p.m., May 12, 1967, some of his tenants complained about noise from across the street and wanted to know "what I was going to do about the noise out there." The noise, he said, came from the headquarters of what was known as CAMP, or Central Area Motivation Project. CAMP is an organization having to do with the social and economic rehabilitation of a large economically depressed area in Seattle's central district. From his apartment window, Mr. Scott had seen a number of people gradually assemble in the yard fronting the CAMP headquarters building. He said some carried baskets of what he thought was food, and others had musical instruments. He thought "the people who assembled there in large numbers dressed differently than normally." He heard music from inside the CAMP building and saw someone passing out yellow balloons to children in the yard. He noticed the defendant because, as he said, "he was the only person in the group who carried a flag."

About 10:30, a curious thing happened. He said:

a red pickup truck came in and brought a piano, an upright piano, parked it right in front of my window,

---

ard, color, ensign or shield, as defined in RCW 9.86.010, by publicly mutilating, defacing, defiling, burning, or trampling upon said flag, standard, color, ensign or shield.

Laws of 1969, 1st Ex. Ses., ch. 110, p. 823.

The enactment adds' the word *knowingly*, eliminates the words *by word* and explicitly prohibits a public burning of the flag.

just a little bit south of it. And there several men came and unloaded it on the ground, carried it across the street to this CAMP Center, carried it up the stairs, up the first three steps there. Carried that piano up these steps and right up here on the sidewalk. Then they proceeded to knock that piano apart. Q. Did they use anything to do this? A. There appeared to be, I rather think from the way the men swung, possibly a couple of sledgehammers and probably axes, was what they used to knock the piano apart. Q. Was it completely knocked apart? A. Yes. Each time they hit the piano everyone would yell. The splinters were flying and it made quite a din there. Q. Did the defendant take part in the destruction of this piano? A. No, I didn't notice him doing that.

Noise from the piano smashing induced Mr. Scott to call the police again, and they arrived to observe the piano debris being loaded and hauled away. After that, Mr. Scott observed the event for which the defendant was charged. Looking through his binoculars, he saw the defendant hold an American flag while another individual set it afire:

But after a little bit then the two men moved together and the defendant held the flag while this other gentleman lit it with a lighter and he held the flag until it burned. And when it got hot enough and the heat intense enough, he dropped it. He pushed it away and it lit towards the other man's feet. Q. You mean the defendant dropped it? A. Yes.

Several Seattle police officers corroborated Mr. Scott's testimony in part, saying that they had seen Turner carrying an American flag that evening; other officers said that later in the week they had heard defendant say he had burned an American flag and would repeat the act at a later time.

Since the record does not show what was said before or after the flag burning, the defendant's actual intent, design or purpose in holding the flag while another set fire to it can only be inferred or guessed at.

Defendant, taking the stand in his defense, denied that he held a flag while another set fire to it; he denied that he participated in any way in a flag burning. He said he had been actively working in Seattle for several civil rights

organizations which he described by their capitalized first letters as "CORE, NACP [*sic*] and SNICK." He was not, he said, a member of these organizations but sympathized with their aims and intended to help them. CORE, he said, meant Congress of Racial Equality, which stood for civil rights. He said the same about NAACP, National Association for the Advancement of Colored People. He was, he said, a helper of an organization whose purpose was to bring an end to war, called "The Committee to End the War in Vietnam," for which he had passed out leaflets and whose parade and demonstrations he had joined. He named a number of other groups and organizations which he had tried to help. He said he was a Dukhobor.[2] Interpreting some Russian writing on the back of his jacket which the state's witnesses had referred to, defendant said it said "Dukhobor;" he explained that he had been raised a Dukhobor and had learned to speak Russian and Chinese because many of the Dukhobors do not speak English. He testified that he was present in the yard of the CAMP Center on May 12th.

He left the CAMP area with others, he said, in a pickup to get the piano. When he returned, he did notice that someone was carrying an American flag. He said he was not aware that anyone had burned a flag there until a friend later told him he had heard on the radio that someone by the name of Turner had been arrested for burning an American flag. That, he said, was the first he'd heard of the flag burning at the CAMP Center. He testified that he never had a flag in his hand at the gathering that night. On cross-examination, he said that, because policemen later followed him around and, as he expressed it, were harassing him, he mentioned that he might burn a flag but had never said he had burned one and was simply making conversation. Defendant estimated the crowd as consisting of approximately 50 people—25 in a circle in the yard and the remainder on the porch.

Defendant makes eight assignments of error, but we need discuss only one because it evokes the major and

---

[2] A religious sect of Russian origin.

determinative issue of the appeal. The assignment arises from his exception to instruction No. 8 which said:

You are instructed that it is not required that you find that the defendant intended to violate the law. You are only required to find that the defendant performed the physical act charged.

The question raised by the challenge to this instruction is whether intent to desecrate the flag, as distinguished from a mere intent to do the physical acts charged, is an element of the crime defined by the Uniform Flag Law, RCW 9.86.030. If intent to defile, deface and mutilate the flag, or intent to cast contempt upon it by the commission of the acts charged, *i.e.*, publicly burning or aiding in the public burning, must be proved, then the conviction cannot stand. If, however, the flag statute as then in effect, RCW 9.86.030, belonged to that class of statutes defining crimes mala prohibita rather than mala in se, then the judgment should be affirmed. *Seattle v. Gordon*, 54 Wn.2d 516, 342 P.2d 604 (1959); *State v. Lindberg*, 125 Wash. 51, 215 P. 41 (1923).

■ Although the legislature and the state's political subdivisions under the police power may in some circumstances declare certain acts, conduct or omissions criminal without regard to the intent or knowledge of the actor, guilty knowledge will be deemed an essential ingredient if the defined crimes involve moral turpitude. 22 C.J.S. *Criminal Law* § 30 (1961). This distinction is seen in the innumerable ordinances, statutes and resolutions which define crimes mala prohibita. Legislation prohibiting offenses mala prohibita, if properly enacted within the police power, is usually upheld and conviction sustained without proof of evil intent or in some instances without proof even of an intent to violate them. Many penal laws, for example, relating to pure food and drugs, labeling, weights and measures, building, plumbing and electrical codes, fire protection, air and water pollution, sanitation, highway safety and numerous other areas, in the exercise of the police power may be phrased and enforced as laws mala prohibita and may require neither proof of intent to do a wrong nor knowledge that the wrong will be done.

■ But as we read the flag desecration statute applied either to a principal or to one who aids and abets in its violation, it does not define crimes mala prohibita but rather offenses mala in se. In essence, to defile or hold up to contempt is conduct involving moral turpitude. Therefore, to sustain a conviction of desecrating the flag as defined by that statute, the acts must have been done knowingly and intentionally with an intent or purpose of defiling and desecrating it or holding it publicly up to contempt.

Our conclusion that the flag desecration statute under consideration, Uniform Flag Law, Laws of 1919, ch. 107, p. 259; RCW 9.86.030, was one defining crimes mala in se as distinguished from those mala prohibita, is, we think, supported in part by the absence of any provision in the statute that to be actionable the prohibited acts must be done with intention to or under circumstances tending to provoke public disturbance, disorder, breach of the peace or riot. The offense does not, therefore, include conduct amounting to provocation or incitement to or advocacy of crime, violence, riot or public disorder. *See Brandenburg v. Ohio,* 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969). Nor does prosecution of defendant Turner in this case evoke the freedom of speech protection of the First Amendment, and the judicially sustained emergency limitation of that protection in circumstances of clear and present danger (*Schenck v. United States,* 249 U.S. 47, 63 L. Ed. 470, 39 S. Ct. 247 (1919); *Frohwerk v. United States,* 249 U.S. 204, 63 L. Ed. 561, 39 S. Ct. 249 (1919); *Debs v. United States,* 249 U.S. 211, 63 L. Ed. 566, 39 S. Ct. 252 (1919)), and the limitation upon the limitation which Mr. Justice Holmes said ought be applied to the clear and present danger doctrine. *See* dissent to *Abrams v. United States,* 250 U.S. 616, 624, 63 L. Ed. 1173, 40 S. Ct. 17 (1919). *Cf., Street v. New York,* 394 U.S. 576, 22 L. Ed. 2d 572, 89 S. Ct. 1354 (1969), where the court reversed a New York flag desecration conviction because it could not ascertain from the record whether the accused had been found guilty of what he said or of what he did.

The statute in question does, as we have noted, employ

language implying that some evil intent or purpose must be shown. Words such as deface, defile, defy or cast contempt upon strongly imply that the described conduct shall be held criminally actionable only when the interdicted conduct is done with an evil design or purpose. If this were not so, the legislature could readily have said otherwise.

The idea that there must be an intent to desecrate and hold up to contempt is supported by an absence until quite recently of national legislation on the subject. In 1968, the Congress broadened the application of an existing District of Columbia statute into a national law. Public L. No. 90-381, § 1; 82 Stat. 291; 18 U.S.C. § 700 (1968). This statute, unlike that under inquiry here (RCW 9.86.030), makes it a criminal offense *knowingly* to cast contempt upon the flag either by publicly mutilating, defacing, defiling, burning or trampling upon it.[3]

Similarly, the recent flag desecration legislation in this state requires that one *knowingly* and publicly cast contempt upon the flag to be guilty. Laws of *1969*, 1st Ex. Ses., ch. 110, p. 823; RCW 9.86.030, as amended, *supra* note 1. Thus, the legislature and the Congress in amendatory legislation supplied in words what we think was earlier implied in law—the requisite element of intent or purpose publicly to desecrate, defile and hold up to contempt and that the intent or purpose with which the acts are done is for the jury to determine.

That preservation of our democratic institutions and constitutional government does not depend upon reading out all elements of design, purpose and intent from the Uniform Flag Law may be seen in a history of the operation of the flag statute of modern Germany. The presence or absence of criminal intent seems to have had little effect one way or the other in the preservation of life and liberty and the pursuit of happiness in that country. Throughout all stages of its modern career, there was in effect in Germany

---

[3]"(a) Whoever knowingly casts contempt upon any flag of the United States by publicly mutilating, defacing, defiling, burning, or trampling upon it shall be fined not more than $1,000 or imprisoned for not more than one year, or both." 18 U.S.C. § 700(a) (1968).

a flag desecration statute. From an autocratic Imperial Germany under the Kaiser into the democratic Weimar Republic and thence into the unspeakably cruel and ruthless dictatorship of the Third Reich regime of Hitler, succeeded in turn by the military government of allied occupation and control, followed then by the present democratic Federal Republic of Germany—there was in the criminal code a flag desecration statute in force. *See* Appendix.

■ Accordingly, unless the statute expressly eliminates the element of intent or design or defines the kinds of offenses which, by their very nature, are classified judicially as mala prohibita, the ingredients of intent, design and purpose should be deemed indispensable to a proof of guilt. To hold otherwise, would make anyone criminally liable who accidentally burned or walked upon the flag in public or unintentionally or accidentally committed some other act toward it which, if intent were present, would clearly constitute a defacing or defilement or a holding up to contempt.

Accordingly, the accused should be allowed to show the jury that, whatever acts may have been proved against him, his purpose in committing the acts was neither to deface, nor to defile, nor to desecrate, nor to cast contempt upon the flag and that his want of such evil intentions would be a defense to the charge. He should be permitted also to prove accident, mistake or fortuitous circumstances in defense. Thus, the defendant should have been allowed on his plea of not guilty to show to the jury that the holding of an American flag while another set fire to it was done, if done at all, without any intent to degrade, desecrate, defile or cast contempt upon it. Instruction No. 8, declaring to the exact contrary, that intent to violate the law was immaterial and that the defendant would be guilty if he performed the physical acts charged regardless of his intent or purpose, was, therefore, reversible error.

■ True, the intent with which acts are done frequently lies hidden in the mind of the actor and may be ascertained only from his conduct and its surrounding circumstances, but the accused's state of mind remains an

issue of fact to be inferred by the jury where intent, purpose and design are elements of the crime charged. The state, to sustain a conviction, is obliged, we think, to prove that the burning of the flag in public, or the aiding or abetting of it, was done with an intent or design or purpose to defile, or defy, or cast contempt upon the flag and in the absence of such an intent, design or purpose the crime has not been shown.

The cause is, therefore, reversed and remanded for a new trial.

HUNTER, C. J., FINLEY, ROSELLINI, HAMILTON, NEILL, and McGOVERN, JJ., concur.

### APPENDIX

The Kaiser's flag desecration statute read:

> Any one who maliciously removes, destroys, injures, or commits insulting mischief on a public emblem of the authority of the Empire, or of a federal sovereign, or an emblem of the majesty of a federal state, shall be punished by a fine up to 600 shillings, or by imprisonment with labour up to two years.

G. Drage, Criminal Code of the German Empire § 135 (Novella of 1876), at 223 (1885). Another section in the German Criminal Code buttressed this one, making it a crime to commit insulting mischief on a public emblem or flag of a foreign state.

> Any one who maliciously takes away, destroys, injures, or commits insulting mischief on a public emblem of the authority of a state, which does not belong to the German Empire, or an emblem of the majesty of such a state, shall be punished by a fine up to 600 shillings, or by imprisonment with labour up to two years.

G. Drage, Criminal Code of the German Empire § 103 a (Novella of 1876), at 213 (1885).

One should not overlook the possible trespasses upon freedom of speech arising from the two statutes side by side. But even in autocratic Imperial Germany, unlike the statute at issue here, the law required that to be criminally actionable the acts be done with malice. Malice in Germany, circa 1871, one could assume to be the legal equivalent of malice in the United States, circa 1969, that is, acts done with an ill will, or a design to effect an evil or unlawful purpose.

A 1932 amendment made substantial changes:

> Whoever publicly profanes (beschimpft) the Reich or one of the states incorporated into it, its constitution, colors or flag, or the German armed forces, or maliciously and with premeditation exposes them to contempt, shall be punished by imprisonment.

United States War Department Pamphlet No. 31-122, Military Government Information Guide, Statutory Criminal Law of Germany § 134a, at

95 (August, 1946) (enacted December 19, 1932; RGB1-I, 548). Significantly, this section is codified under "Profane Acts against the German Reich—*Beschimpfungen des Reiches und der Länder.*"

In 1935, after the Hitler regime established its dictatorship, the German 'flag desecration statute was, in a separate section, broadened to cover profanation of the swastika and other banners and symbols of the Nazi party in the following language:

> Whoever publicly profanes the German National Socialist Labor Party, its subdivisions, symbols, standards and banners, its insignia or decorations or maliciously and with premeditation exposes them to contempt shall be punished by imprisonment.
>
> The offense shall be prosecuted only upon order of the Reichsminister of Justice who shall issue such order in agreement with the Führer's deputy.

United States War Department Pamphlet No. 31-122, *supra,* at 96, as enacted June 28, 1935.

The Allied Control Council for Germany, which assumed governmental power as an act of occupation following the defeat of the Third Reich in World War II, in Law No. 11 (Control Council for Germany, Law No. 11, Arts. 1 & 4, United States War Department Pamphlet No. 31-122, *supra*), repealed the section pertaining to the swastika and other Nazi symbols.

Time seems to have come full circle then, for in 1951, the Federal Republic of Germany, emerging from World War II and the apparent demise of Nazism, enacted section 96 as follows:

> 1. Anybody who publicly, in an assembly or by dissemination of writings, phonographic recordings, pictures or exhibits,
>
> (1) defames or maliciously villifies the Federal Republic of Germany, one of her States, or the constitutional order,
>
> (2) urges or casts disparagement upon their colors, flags, coats-of-arms, or national anthems, shall be punished by imprisonment.
>
> 2. Equally punished shall be anybody who removes, destroys, injures or disfigures, or causes disparaging mischief to any publicly displayed national flag or any officially and publicly displayed insignia of sovereignty of the Federal Republic of Germany or one of her States. The attempt is punishable.
>
> 3. If the perpetrator has committed the deeds named in paras. 1 and 2 with the intent of furthering efforts designed to impair the existence of the Federal Republic or the constitutional principles designated in § 88, the punishment shall be imprisonment for a term of not less than three months. [8-30-1951].

G. Mueller and T. Buergenthal, German Penal Code of 1871 § 96, Defamation of the State, at 60 (1961).