George MISKOVSKY, Appellee,

v.

The OKLAHOMA PUBLISHING COM-
PANY, a corporation, Appellant.

No. 55326.

Supreme Court of Oklahoma.

Jan. 12, 1982.

Rehearing Denied April 6, 1982.

Certiorari Denied Oct. 12, 1982.
See 103 S.Ct. 235.

Everett J. Sweeney and E. Joe Lankford, Norman, and Carroll E. Gregg, Oklahoma City, for appellee; David A. Anderson, Austin, Tex., of counsel.

David Machanic, Michael Minnis, Pierson, Ball & Dowd, Oklahoma City, and Tom A. Lucas, Lucas & Cate, Norman, for appellant.

BARNES, Vice Chief Justice:

The dispositive issue in this cause is whether the evidence presented by a candidate for the United States Senate, George Miskovsky, in a libel action against a local publisher, Oklahoma Publishing Company (OPUBCO), was sufficient to permit the submission of the cause to a jury. We hold that it was not.

The facts of the cause before us are as follows: In August of 1978, eight Oklahomans had become candidates for the Democratic nomination for the office of the United States Senate. Among the candidates were, then Governor, David Boren, former State Senator and Representative, George Miskovsky, and Anthony Points, a newcomer to the political arena. During the campaign, Mr. Miskovsky, along with other candidates, was invited to attend a candidates' forum conducted by the Women's Democratic Club of Canadian County in El Reno, Oklahoma. Although Mr. Miskovsky, Mr. Points, and another candidate, Mr. Bridges, accepted the invitation, other Democratic candidates did not attend the forum, which was held at the Ponderosa Restaurant. During the forum, each candidate was invited to make a brief statement. While addressing the group, candidate Points read from a political flyer, copies of which he had distributed to the audience. In part the flyer read:

"I am against homosexuals or bisexuals in office or government. They are threats to our national security. They are subject to being blackmailed and will give out a favor or leak information from the government in return for having their homosexual identity kept secret.

"There is a side to David Boren that is a known fact in legal and political circles. And that's the fact that David Boren frequents with homosexuals and I'm putting it lightly.

"I don't think that is what you want for a U.S. Senator."

In addition to reading these remarks, candidate Points categorically stated that "Governor David Boren is a homosexual."

Mr. Miskovsky, on the following day, August 10, 1978, delivered a letter to the office of Governor Boren in which he set forth Mr. Points' charges against Boren, asking the Governor to answer several questions. That letter read as follows:

"The Honorable David Boren
Governor State of Oklahoma
State Capitol
Oklahoma City, Oklahoma
Dear Gov. Boren:
Yesterday I attended a noon meeting of the Canadian County Democratic Women's Club at the Ponderosa Restaurant in El Reno. About three dozen members of the club were present as well as club vice president, Mrs. Donald J. (Floretta) Cholston of El Reno, and two other Democratic candidates for the U.S. Senate, Dean Bridges and Anthony Points.
I was called upon to address the group about issues and I did, as did Mr. Bridges. Mr. Points addressed the group and distributed a campaign flyer (a copy of which is enclosed herewith) containing the following verbatim transcript:

'I am against homosexuals in the school system. They are a threat to our children. They are like vultures 'preying' on our young.'

'I am against homosexuals or bisexuals in office or government. They are a threat to our national security. They are subject to being blackmailed and will give out a favor or leak information from the government in return for having their homosexual identity kept secret.'

'There is a side to David Boren that is a known fact in legal and political circles. And that's the fact that David Boren frequents with homosexuals and I'm putting it lightly.'

'I don't think that is what you want for a U.S. Senator.'

In addition to distributing the above written bulletin, Mr. Points added, among other things, the oral categorical statement, 'David Boren is a homosexual.'

After the meeting one of the ladies said she had not heard of this before, and others said they had heard rumors about the charge.

It is the first time I have heard this direct, categorical statement made in public by a candidate for the U.S. Senate. For this reason I am asking you to respond to the following questions:

Do you know what a homosexual or bisexual is?

Are you a homosexual or bisexual?

Have you ever been a homosexual or bisexual?

Have you ever engaged in homosexual or bisexual activity?

I believe it is the right of every citizen, if it can be ascertained, to know if a candidate for U.S. Senator is afflicted with this kind of abnormal behavior.

A U.S. Senator has access to highly sensitive information vital to the defense of this country and our NATO allies.

I believe it is the right of every citizen to know if a candidate is afflicted with any physical, mental or philosophical weakness that might be dangerous to our national security or which might jeopardize the best interests of the majority of the people.

If a candidate is a homosexual, a person who is mentally deranged or a person of bizarre philosophical demeanor, then, the people have a right to know it.

And the candidate should disclose it in order to protect his effectiveness as the representative of the majority and free himself from any politically motivated intrigue, blackmail, extortion or compromise to prevent disclosure of his true identity.

The people are entitled to an immediate response. Such response should be subscribed by you under oath.

> Sincerely,
>
> George Miskovsky"

The letter was delivered to the Governor's office approximately ten minutes prior to a press conference held by Mr. Miskovsky. At the press conference, Mr. Miskovsky told members of the press and the media of Mr. Points' statement and of his letter to the Governor.

In preparation for the press conference, Mr. Miskovsky's press agent personally called various members of the media, telling them that this was going to be a "hot" press conference that would be worthy of their attention.

Governor Boren, who was out on the campaign trail, and away from the Capitol, upon hearing of Miskovsky's press conference, flew back to Oklahoma City and held a make-shift press conference at Wiley Post Airport, categorically denying the charges against him.

The next day, August 11, 1978, the Oklahoma Publishing Company (OPUBCO), publisher of *The Daily Oklahoman,* a morning paper, and *The Oklahoma City Times,* an evening paper, published three news articles and an editorial dealing with Mr. Points' charges, Mr. Miskovsky's press conference, and the Governor's response to these events. A few days later, OPUBCO also published an editorial cartoon lampooning Miskovsky's actions. These five publications—three news articles, an editorial, and an editorial cartoon—are the publica-

tions which Mr. Miskovsky claims libeled him.

## I.

Before addressing the issues presented, we will first discuss the burden which Mr. Miskovsky was required to meet in order to have his case presented to a jury. Because Mr. Miskovsky admits that for the purposes of this libel action, he is a "public figure", there is no question that the *New York Times v. Sullivan* standards are applicable in this cause. In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in considering a libel action brought by an elected Commissioner of the City of Montgomery, Alabama—a public official—the United States Supreme Court, in discussing the right of free speech and free press guaranteed by the First Amendment to the United States Constitution, noted that cases such as the one before us are considered against " . . . a profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." The Court then went on to note that an " . . . erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have 'breathing space' . . ."

The Court later quoted with approval language of Justice Burch of the Supreme Court of Kansas in *Coleman v. MacLennan*, 78 Kan. 711, 98 P. 281 (1908), stating:

" 'It is of the utmost consequence that the public should discuss the character and qualifications of candidates for their suffrages. The importance to the State and to society of such discussion is so vast, and *the advantages derived are so great, that they more than counter-balance the inconvenience of private persons*

whose conduct may be involved, and *occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great.* The public benefit from publicity is so great, and the chance of injury to private character is so small, that such discussion must be privileged.' " (78 Kan. at 725, 98 P. at 286.) [Emphasis added]

Based upon our "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open," and the "breathing space" needed to protect the freedoms of expression, the United States Supreme Court held that the constitutional guarantees required a Federal rule which prohibited public officials from recovering damages in libel actions, unless certain prerequisites were met. The Court stated:

"The constitutional guarantees require, we think, a Federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct, unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.)

■ This "New York Times standard" was later found to apply not only to public officials, but also "public figures".[1] As Mr. Miskovsky was a public figure, the standard quoted above applies in the case at hand. Thus, in order to prevail, Mr. Miskovsky must show:

(1) The publication of a defamatory statement;

(2) That the defamatory statement was false; and

(3) That the defamatory falsehood was made with "actual malice"—made with knowledge that it was false, or

---

1. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). See *Washington v. World Publishing Co.,* 506 P.2d 913, 916 (Okla.1972) (candidate for United States Senate a public figure).

with reckless disregard of whether it was false or not.

In discussing the element of "actual malice", the United States Supreme Court, in *New York Times v. Sullivan,* held that the Constitution demanded that malice be shown with "convincing clarity".[2] Additionally, the Supreme Court noted that there was evidence that the New York Times published the alleged libelous publication without checking its accuracy against the news stories in the Times' own files. In rejecting the plaintiff's contention that such failure to check constituted sufficient evidence of malice, the Court stated:

"... The mere presence of the stories in the files does not, of course, establish that the Times 'knew' the advertisement was false, *since the state of mind required for actual malice would have to be brought home to the person in the Times' organization having responsibility for the publication of the advertisement."*

█ Thus, we see that Mr. Miskovsky, in order to prove malice, must not only show that the state of mind required was brought home to the persons in OPUBCO's organization having responsibility for the publication of the alleged libelous publications, but must also do so with convincing clarity.

The constitutionally mandated proof of "actual malice" was further defined in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In that case, the Court noted that although "reckless disregard" could not be fully encompassed in one infallible definition, it did require that a defendant entertain some doubt as to the truth prior to publication, stating:

"... Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubt as to the truth of*

*his publication.* Publishing with such doubt shows reckless disregard for truth or falsity and demonstrates actual malice." (390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.)

In so ruling, the Supreme Court went on to note that:

"... Concededly, the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But New York Times, and succeeding cases, has emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censureship and thus adequately implement the First Amendment policy." (390 U.S. at 731–32, 88 S.Ct. at 1326, 20 L.Ed.2d at 267.)

## II.

In *New York Times v. Sullivan,* the Court states:

"... This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases view the evidence to make certain that these principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated.'" (370 U.S. at 285, 84 S.Ct. at 728, 11 L.Ed.2d at 798.)

Like the U.S. Supreme Court, we also, in proper cases, must review the evidence to make certain that constitutional principles have been correctly applied. The case before us is such an instance. After reviewing the evidence, we conclude that with respect to each publication, Mr. Miskovsky has failed to present evidence of defama-

**2.** 376 U.S. at 285–86, 84 S.Ct. at 729, 11 L.Ed.2d at 710. Also see *Beckley Newspapers*

*Corporation v. Hanks,* 289 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).

tion, falsehood, and malice, sufficient to present the issue to a jury.

We will first examine the three news articles which Mr. Miskovsky argues were defamatory.

■ The first article which allegedly defames Mr. Miskovsky appeared in The Daily Oklahoman on August 11, 1978, with the headline, "Sex Charge a Lie, Governor Boren Replies". This article was a straightforward account informing the reader that candidate Miskovsky had called a press conference, and that Mr. Miskovsky had asked Governor Boren to answer accusations made by another candidate that Boren was a homosexual. The article goes on to detail statements made by Mr. Points, Governor Boren's denial of the charges. Additionally, the article quoted from portions of Mr. Miskovsky's letter to Governor Boren, and reported reactions to the accusations and Mr. Miskovsky's letter, by both Governor and Mrs. Boren. Miskovsky argues that within this article the seed of conspiracy between him and Points is planted in the public's mind when the article stated:

"Asked if he thought Miskovsky and Points worked together to discredit him, Boren replied, 'I will just have to leave that to your own speculation.' "

We simply find no merit to Mr. Miskovsky's position that the article, because of the above quoted paragraph, is libelous. The statement quoted is neither false nor defamatory. Because Mr. Miskovsky used Mr. Points' statements, it is understandable that the news media might wonder if Mr. Miskovsky and Mr. Points were working together. It was certainly not libelous to inquire of the Governor whether he thought such could be the case, nor was it libelous to report the Governor's response. The statement does not defame Mr. Miskovsky, as it neither holds him up to ridicule, scorn, or contempt. Nor can the statement be said to be libelous, because the statement is not false. For these reasons, we hold that the trial court erred in permitting the jury to consider this publication as possibly libelous.

The second article, entitled "Allegations Stir Storm", which also appeared in the August 11 issue of The Daily Oklahoman, began with the following lead:

"Allegations against Gov. David Boren raised by fellow U.S. Senate candidates George Miskovsky and Anthony Points spurred a storm of indignation Thursday in the news media, were deplored by two other candidates and prompted a flurry of support at Boren campaign headquarters."

■ Continuing, the article chronicled reactions to the events of the past day, quoting from various newspaper articles and radio broadcasts across the State. The article also reported the reactions of Governor Boren's campaign secretary, and the reactions of several other senatorial candidates. Among reactions chronicled were the following:

"Rob Pyron, Boren's campaign secretary, said campaign headquarters was swamped with calls Thursday afternoon from persons voicing support for the governor and anger over the allegations of Points and Miskovsky.

\* \* \* \* \* \*

"Oklahoma City radio station KTOK said the names of Miskovsky and Points should be stricken from the election ballot.

" 'Such loathsome and degrading statements, which have been made with no proof, speak eloquently of the kind of statesmanship either Miskovsky or Points would lend to the U.S. Senate if they were elected.'

"The Shawnee News-Star editorialized in Friday editions that the charge that Boren is a homosexual 'would be more at home on the walls of a 'saloon toilet'.

\* \* \* \* \* \*

" 'Cesspool allegations have no place in the political arena. We believe George Miskovsky has no place in it any longer either.' "

Mr. Miskovsky argues that the above quoted statements are falsehoods which are defamatory. He argues that the allegations against Governor Boren were not made by him, but rather by Anthony Points alone. Thus, Miskovsky concludes that any suggestion that he made the allegations is false, and defames him because it accuses him of a crime—criminal libel.

In addressing these contentions, we would first note that the statement that the allegations against Governor Boren were "raised" by George Miskovsky and Anthony Points is not a false statement. The American Heritage Dictionary of the English Language defines the word "raised" to include "increasing in strength or intensity, and arousing or stirring up." To say that Mr. Miskovsky did not increase the intensity of the allegations made by Mr. Points would be sheer nonsense. It was, after all, Mr. Miskovsky who called Mr. Points' statements to the public's attention. It was, after all, Mr. Miskovsky who called the press conference to discuss that very issue. And it was Mr. Miskovsky who wrote the Governor asking him to respond to the allegations.

The newspaper article also carefully pointed out that Mr. Miskovsky used Points' campaign material as the basis for "implications" of homosexuality. Thus, to report that various people in organizations across the State were disgruntled over the allegations of Mr. Points and Miskovsky could hardly be said to be false, for it was Miskovsky who took the utterances of a minor candidate and publicized them, making them a cause celebre. To hold that Mr. Miskovsky's actions could not be taken as implications of homosexuality would be a denial of the obvious.

With respect to the other statements in the article, in which OPUBCO reported that other news media had referred to Mr. Miskovsky's action as having won him "a place in state history saying he 'took the prize for the filthiest stunt that has ever been played by a serious candidate for major public office in this state' ", are simply all statements of opinion, which even Miskovsky admits in his brief are not actionable. As opinions they are not statements of fact, and therefore cannot be false.

For the above stated reasons, we hold that it was error to submit the article entitled "Allegations Stir Storm" to the jury, allowing them to find that this article had defamed Miskovsky.

The third and last news article was published by OPUBCO in The Oklahoma City Times on August 11, 1978. It was entitled "Boren's Friends Express Disgust". The article's lead read:

> "Longtime friends and close associates of Gov. David Boren expressed shock and disgust in his hometown today after allegations surfaced Thursday that he is a homosexual."

The article then went on to quote the reactions of several Seminole citizens, among them Ward Lynn, father-in-law of Boren's press secretary, Rob Pyron. It is the reporting of Mr. Lynn's comments which Mr. Miskovsky objects to, and characterizes as false and libelous. The paragraph dealing with Mr. Lynn's reaction read as follows:

> "Ward Lynn, father-in-law of Boren's press secretary, Rob Pyron, said he expected Miskovsky to be the 'hatchet man' in the campaign."

Although we can appreciate why Mr. Miskovsky is not fond of the epithet "hatchet man", such an epithet is not libelous because it is not a statement of fact, but rather a judgmental statement in which the maker of the same expresses his views. It is similar to calling someone a "scalawag", a "rake", or a "scoundrel". Such statements are opinionative and not factual in nature. Thus, such statements can hardly be said to constitute falsehoods. As they cannot be false, they cannot be considered libelous. Thus, once again the trial court erred in submitting this article to the jury, allowing the jury to find such statements to be libelous.

We next turn to the editorial and editorial cartoon which Mr. Miskovsky argues libeled him. The editorial cartoon, entitled "Miskovsky and Mud", appeared in The Daily Oklahoman on Friday, August 11, 1978. The editorial started out with the statement that:

"George Miskovsky has sunk to a new low in Oklahoma political rhetoric—and for him that takes some doing.

"In a press conference reported on elsewhere in The Oklahoman, the septuagenarian lawyer has attempted to inject some sign of vitality in his moribund campaign for the Democratic nomination for the U.S. Senate.

"His tactic was to indirectly suggest, in the form of a letter asking questions, that Gov. David Boren has homosexual tendencies.

"Were it not for the fact that American Law and tradition make it virtually impossible to libel or slander a political figure, Miskovsky's words would be actionable. As it is, they are merely despicable and stupid."

The editorial went on to state that it is on the record and on the positions taken on national issues that Boren's Senate candidacy should be weighed, and not "... on the scurrilous defamation hurled by Miskovsky.... Miskovsky should save his gutter theatrics for the next time he is defending some scoundrel in criminal court...."

■ As above, opinionative statements, such as "scurrilous defamation" and "gutter theatrics" are not statements of fact, but statements of opinion. What one individual may consider scurrilous, another may think commendable. What one might consider "gutter theatrics", another may think of as "strategical genuis". Likewise, one might refer to an individual as a "scoundrel", while another thinks him a "saint". Such characterizations are not factual, but rather judgmental. Accordingly, they cannot form the basis of a libel action, as they cannot be verified as true or false.

Lastly, the characterization of Miskovsky's words as "actionable" we do not believe accuses Mr. Miskovsky of a criminal action. In so holding, we would note that in *Greenbelt Coop. Pub. Asso. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1977), the Supreme Court of the United States held that under the circumstances of that case, as a matter of constitutional law, it was clear that no reader could have thought that because of the use of the word "blackmail", the plaintiff was being charged with the commission of a criminal offense. We think it equally clear in the case at hand that no reasonable reader could have interpreted the statement that Mr. Miskovsky's words were actionable as imputing a criminal act to Mr. Miskovsky. In so holding, we note that no evidence at the trial was introduced to show that any reader interpreted the statement to have imputed the commission of criminal libel on Mr. Miskovsky's part. Accordingly, we cannot say that the statements in the editorial entitled "Miskovsky and Mud" could form the basis of a libel action. The court thus erred in submitting this article to the jury.

The last publication relied upon by Mr. Miskovsky in his libel action was an editorial cartoon published in The Oklahoma City Times on August 14, 1978. That cartoon is pictured below.

## 'Isn't that right, Anthony?'

Mr. Miskovsky's position is that the cartoon is a direct representation that he put Points up to calling Governor Boren a homosexual, and that he was conspiring with Points, and that Miskovsky masterminded the conspiracy. Additionally, Miskovsky argues that the cartoon is defamatory, as it falsely imputes that he committed a crime—a criminal libel.

■ Without deciding, and even assuming, that the meaning attributed to the cartoon of Miskovsky was defamatory and a statement of fact, there was no evidence that it was published with knowledge of falsity or with reckless disregard as to the truth of the cartoon.

Mr. Standard, who approved the cartoon for publication, testified that he saw the cartoon as showing a connection between Mr. Miskovsky and Mr. Points at the press conference, but not prior to the press conference. He testified that:

"Obviously, Mr. Miskovsky used Mr. Points as his whole excuse for calling the press conference and sending a letter to the Governor, and to that extent, sure, there was a connection."

As to the artificial halo over Mr. Miskovsky's head, Standard thought this denoted a self-righteous attitude on Miskovsky's part. To Standard, it meant that "Miskovsky was attempting to escape responsibility by, at the press conference, making it appear that Mr. Points had caused all of this, rather than Mr. Miskovsky."

Additionally, the cartoonist who drew the cartoon testified that his purpose in the cartoon was to comment on Miskovsky's asking Boren the four questions at the press conference. He "intended to show that Mr. Miskovsky was exploiting the words of Mr. Anthony Points." He further testified that when he drew the cartoon he did not intend to imply, nor did he think he implied, that

Mr. Miskovsky was responsible for Mr. Points' statements. Mr. Lowe, the cartoonist, also testified that it did not enter his mind that the cartoon could be interpreted that way. While Mr. Miskovsky did show that the newspaper was out to "blister" him for his actions, and that the newspaper did favor Mr. Boren's candidacy over his, there simply was no evidence introduced to show that the paper intended to use false statements, or that the paper had any serious doubts as to the statements they published.

Lastly, even assuming further that the cartoonist or the person who approved the cartoon intended the meaning attributed to it by Miskovsky, there was no evidence that OPUBCO, at the time of publication, knew the meaning was false. The mere failure to investigate cannot establish reckless disregard for the truth; rather, those responsible for the publication of the cartoon must act with a "high degree of awareness of ... probable falsity."[4] The evidence in this case did not reveal that OPUBCO had cause for such an awareness at the time of publication of the cartoon.

For the above stated reasons, we hold that the trial court erred as a matter of law in submitting the cause to the jury, as it was error to submit any of the five publications relied upon to the jury.

Accordingly, the action of the trial court is reversed, and the case is remanded to the trial court with directions to enter judgment for appellant OPUBCO

It is so ordered.

IRWIN, C.J., HODGES, LAVENDER, SIMMS and HARGRAVE, JJ., and BACON and BOYDSTON, Special Justices, concur.

DOOLIN, J., dissents.

Upon the disqualification of Justice Williams and Justice Opala, the Honorable Kenneth D. Bacon and the Honorable John D. Boydston were assigned to act as Special Justices in this case.

---

4.  *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).