Terry R. WEST, Plaintiff and Appellant,

v.

THOMSON NEWSPAPERS, d/b/a The Daily Spectrum, Don E. Hogun, Brent Goodey, and Rick Guldan, Defendants and Appellees.

No. 910066–CA.

Court of Appeals of Utah.

May 28, 1992.

Terry R. West, pro se.

Randy L. Dryer, Salt Lake City, for defendants and appellees.

Patrick A. Shea and Scott M. Matheson, Jr., Salt Lake City, for amicus curiae Soc. of Professional Journalists.

Before BENCH, GARFF and JACKSON, JJ.

## OPINION

BENCH, Presiding Judge:

Terry West appeals the dismissal of his libel claims against the defendants. West brought suit for statements made in three different articles published in *The Daily Spectrum* newspaper. We affirm in part and reverse in part.

## BACKGROUND

Appellee Rick Guldan, a reporter for *The Daily Spectrum*, wrote two articles that were critical of West, the mayor of the small Utah town of La Verkin. Among other accusations and criticisms, the articles criticized West for opposing the purchase of a municipal power plant by the town before his election, but then reversing his position once elected. The trial court found that the articles implied that West adopted the politically popular view in order to get elected and that the connotation of the articles was that West was "a liar and the worst kind of political cheat."

In his first article, Guldan also questioned West's ability to "keep the facts straight." Guldan reported that when there had been a break-in at a business owned by West, West had initially told the police that nothing was missing, but the police report subsequently indicated that several rugs valued at approximately $7,000 had been taken. West's insurance claim, according to Guldan, valued the rugs at approximately $13,000. The trial court found that the story implied that West filed a fraudulent insurance claim.

Following publication of the first article, West met with the publisher of the paper, appellee Don Hogun, and challenged the factual accuracy of the article. In particular, he stated that he had always supported municipal power and that prior to the election he had sent to the citizens of La Verkin a letter indicating his support. Hogun was provided with a copy of the letter to the citizens. West also gave Hogun a rebuttal "letter to the editor" challenging the many issues raised in Guldan's article.

Hogun consulted the paper's local counsel who indicated that the story about the insurance claim was actionable because it was factual and therefore warranted a retraction if false, but that the statements regarding West's position on municipal power constituted protected opinion and no retraction was necessary, even if the statements were false.

*The Daily Spectrum* then ran a retraction of the story involving the $13,000 insurance claim but did not retract its statements concerning West's change in position on municipal power. Instead, Guldan wrote a second article challenging the points addressed in West's rebuttal letter which was published in the letters to the editor section that same day. In particular, Guldan asserted that if West was not in fact opposed to municipal power prior to the election, then he "certainly did a masterful job of creating an illusion he was."

Several months following publication of the foregoing articles, appellee Brent Goodey, the managing editor of *The Daily Spectrum,* wrote an article titled "How I came to 'love' La Verkin's mayor." Goodey indicated his frustration with West and La Verkin's planning commission chairman, Phil Phillips, whom Goodey portrayed as West's "political enemy." Goodey accused them both of "repeated, and not too subtle attempts to manipulate the press." Goodey then recounted the efforts of both West and Phillips to have the paper publish their versions of events in La Verkin politics.

West brought suit for the statements regarding his purported change in position on municipal power, the insurance claim story, and the charge of attempting to manipulate the press.

## STANDARD OF REVIEW

Part of this case comes to us as an appeal of a summary judgment granted under Utah Rule of Civil Procedure 56.

Our standard of review when considering challenges to a summary judgment is settled. A grant of summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. In determining whether the trial court correctly found that there was no genuine issue of material fact, we view the facts and inferences to be drawn therefrom in the light most favorable to the losing party. And in deciding whether the trial court properly granted judgment as a matter of law to the prevailing party, we give no deference to the

trial court's view of the law; we review it for correctness.

*Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989) (citations omitted). Furthermore, "[w]e accord no deference to the trial court's conclusion that the facts are not in dispute...." *Kitchen v. Cal Gas Co.,* 821 P.2d 458, 460 (Utah App.1991).

The remainder of the case comes to us as an appeal from a dismissal under Utah Rule of Civil Procedure 12(b)(6).

A motion to dismiss is appropriate only where it clearly appears that the plaintiff or plaintiffs would not be entitled to relief under the facts alleged or under any state of facts they could prove to support their claim. In determining whether the trial court properly granted the motion, we must accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff.

*Prows v. Department of Financial Insts.,* 822 P.2d 764, 766 (Utah 1991) (citations omitted).

## RULE 54(b)

■ The claim against Guldan regarding his initial insurance story remains before the trial court.[1] The trial court certified all other claims as final and appealable under rule 54(b) of the Utah Rules of Civil Procedure.[2] If a trial court improperly grants rule 54(b) certification, however, this court does not have jurisdiction to hear the appeal. *See Kennecott Corp. v. Utah State Tax Comm'n,* 814 P.2d 1099, 1100 (Utah 1991). Since the propriety of rule 54(b) certification presents a jurisdictional question, we raise it sua sponte. *Id.*[3] Whether

---

1. The trial court found, as a matter of law, that Guldan's statements in his second article regarding the initial insurance story were not defamatory. Inasmuch as West does not address this ruling in his briefs, we assume that he is not appealing it and we do not address it.

2. Rule 54(b) provides in relevant part:
   When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third party claim, and/or when multiple parties are involved, the court may direct the entry of a

final judgment as to one or more but fewer than all of the claims or parties only upon an express determination by the court that there is no just reason for delay and upon an express direction for the entry of judgment.

3. In light of the Utah Supreme Court's recent decisions rejecting rule 54(b) certifications, *see Bennion v. Pennzoil,* 826 P.2d 137 (Utah 1992); *FMA Leasing Co. v. Citizens Bank,* 823 P.2d 1065 (Utah 1992); *Webb v. Vantage Income Properties,* 818 P.2d 1 (Utah 1991); *Town of Manila v. Broadbent Land Co.,* 818 P.2d 2 (Utah 1991), we

an order is eligible for rule 54(b) certification is a question of law that we review for correctness. *Id.*

■ Our first inquiry is whether the claims against Guldan for his municipal power statements constitute claims that are separate from the claim against Guldan for the erroneous insurance story. In *Kennecott,* the Utah Supreme Court adopted the Seventh Circuit's approach for determining whether there are multiple claims. *See Kennecott,* 814 P.2d at 1104. In simplified terms, the inquiry is whether there is a substantial factual overlap between the issues certified for appeal and the issues remaining before the trial court. The supreme court indicated that this inquiry may generally be satisfied by determining whether the resolution of an issue on appeal would constitute res judicata of an issue remaining below. *Id.* at 1104–05.

■ The substance of West's lawsuit is that Guldan defamed him several times. West's multiple claims, therefore, are not simply multiple legal theories being applied to the same act. *Cf. Kennecott,* 814 P.2d at 1100. Each alleged defamation is a separate injury giving rise to a separate and distinct claim. The resolution of a given libel claim arising from one statement would not have a res judicata effect on the other libel claims arising from the other statements. The claims against Guldan arising from the municipal power statements may therefore properly be severed from the insurance claim that remains below.

■ The claims against Hogun and Goodey are also properly before us, but for a different reason. Rule 54(b) provides that if multiple parties are involved, the trial court may "direct the entry of a final judgment as to one or more but fewer than all ... the parties." The supreme court's recent analysis regarding the separateness of claims simply does not apply to the certification of final judgments against separate parties. There is no dispute as to whether

Hogun and Goodey are separate parties. All claims against them are final and they have no unresolved matters remaining below. They are therefore entitled, under rule 54(b), to have the appeals brought against them decided now so that their legal status is not suspended indefinitely due to the pendency of the matter remaining below.

## ANALYSIS
### Opinion Privilege

■ In both of Guldan's articles he accused West of changing his position on whether La Verkin should purchase its own power plant. The first article contained the following:

> Terry West says the city council should listen to the people. The people spoke last November in a general election on the issue of municipal power. The people said they didn't want it, and Terry West, when running for mayor, was opposed to it. However, the first thing West did as mayor was ignore the wishes of the people (claiming they weren't qualified to make that decision) and reactivated the municipal power issue. Apparently West believes you should only listen to the people when they agree with you.

In the second article, Guldan stated the following regarding the municipal power issue:

> I said Mayor West had been opposed to municipal power during the election. The mayor claims he never took that position. Several La Verkin citizens, however, have told me that prior to the election they were under the impression West was opposed to municipal power, which is why they voted for him.
>
> Phil Phillips, who serves as chairman of the planning and zoning commission, said West came to him after the election and said he was changing his position on municipal power and would support it. If West never actually came out before

---

requested additional briefing from the parties. Even though parties may have a rule 54(b) certification from the trial court, they typically should include in their briefs a short discussion

on the propriety of the certification in order to assist the appellate court in determining jurisdiction.

the election and said he was opposed to municipal power, he certainly did a masterful job of creating an illusion he was.

Despite the trial court's conclusion that the statements were actionable because they could be found defamatory,[4] it granted partial summary judgment to Guldan, ruling that his municipal power comments were absolutely protected under the First Amendment of the United States Constitution.[5]

The trial court applied *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), in ruling that Guldan's comments were constitutionally privileged. In *Milkovich*, the Supreme Court effectively eliminated any claimed or perceived constitutional privilege for "opinion" while creating a new analytical framework for applying the right to free speech as a shield against libel suits. West asserts that the trial court misapplied *Milkovich* and that Guldan's comments are not absolutely privileged. We agree.

In *Milkovich*, a newspaper reporter implied that a wrestling coach, Michael Milkovich, had committed perjury about a fight during a wrestling match between his home team of Maple Heights High School and the visiting team from Mentor High School. Following the altercation, the Ohio High School Athletic Association (OHSAA) conducted a hearing. OHSAA placed the Maple Heights team on probation for a year and declared the team ineligible for the next state tournament. Several parents and wrestlers sued in state court for a restraining order against OHSAA's ruling. Milkovich testified in the state court proceeding. The trial court enjoined OHSAA's ruling on due process grounds.

The next day, a column appeared in the local newspaper with the heading, "Maple beat the law with the 'big lie.'" *Id.* 110 S.Ct. at 2698. The column implied that Milkovich had committed perjury in the state proceedings. "Anyone who attended the meet, whether he be from Maple Heights, Mentor, or [an] impartial observer, knows in his heart that Milkovich and Scott lied at the hearing after each having given his solemn oath to tell the truth." *Id.* (quoting *Milkovich v. The News-Herald*, 46 Ohio App.3d 20, 21, 545 N.E.2d 1320, 1321–22 (1989)).

**4.** Defendants asserted below that these statements could not be found defamatory by a reasonably jury. By considering the environment in which the statements were made, the trial court correctly ruled otherwise.

> Of course, to determine whether or not the statement is defamatory one must consider the statement and its meaning in the context in which the statement was made and not in a vacuum. This allegation of a change of position was made following a hotly contested election in a small community where candidates lost or won depending upon their announced position regarding municipal power. The voters had, prior to the election, expressed their opposition to the acquisition of a power distribution system by the City of La Verkin. The voters were therefore likely to elect those whose [sic] shared the opposition espoused by the majority. Under those circumstances, it is clear that a candidate who would espouse opposition to municipal power to get elected and then immediately pursue a pro-municipal power agenda as Mayor of the city would be viewed as a liar and the worst kind of political cheat. To suggest that those who trusted such a man and voted for him because of his announced intentions would not, following his change of heart, have at least contempt for him borders on the ridic-

ulous. The statements of the defendants, if made as assertions of fact, falsely and with actual malice, would clearly be defamatory as they would hold the plaintiff up to contempt, hatred, and ridicule in his community.

**5.** Defendants, joined by amicus curiae Society of Professional Journalists, urge this court to adopt an opinion privilege under Article I, Section 15 of the Utah State Constitution. It appears from a review of the record, however, that defendant did not raise this state constitutional argument below. "[W]e generally will not consider an issue, even a constitutional one, which the appellant raises on appeal for the first time." *State v. Webb*, 790 P.2d 65, 77 (Utah App.1990). "[T]he proper forum in which to commence thoughtful and probing analysis of state constitutional interpretation is before the trial court, not, as typically happens ... for the first time on appeal." *State v. Bobo*, 803 P.2d 1268, 1273 (Utah App.1990). *See also Zions First Nat. Bank v. National Am. Title Ins. Co.*, 749 P.2d 651, 654 (Utah 1988) ("great benefit" may be derived from trial court's view on legal issues). Inasmuch as defendants' state constitutional arguments do not qualify for any of the exceptions to this general rule, *see State v. Archambeau*, 820 P.2d 920, 922 (Utah App.1991), we do not address them. They may, however, properly be addressed on remand.

Milkovich brought suit against the reporter and the newspaper. After the case had made several trips up and down the appellate ladder, the Supreme Court granted certiorari to review "the Ohio courts' recognition of a constitutionally-required 'opinion' exception to the application of its defamation laws." *Id.* at 2701.

The defendants in *Milkovich* relied upon the following dicta appearing in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), for the proposition that opinion is absolutely protected by the First Amendment: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." 418 U.S. at 339–40, 94 S.Ct. at 3007 (footnote omitted).

The Supreme Court pointed out that the foregoing quote from *Gertz* was merely a "reiteration of Justice Holmes' classic 'marketplace of ideas' concept," *see Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J. dissenting), and that the term "opinion" in the second sentence should be equated with the term "idea" in the first. Therefore, the Court concluded, "we do not think this passage from *Gertz* was intended to create a wholesale defamation exception for anything that might be labeled 'opinion.'" *Milkovich*, 110 S.Ct. at 2705.

In rejecting any "opinion" privilege, the Supreme Court reasoned that an unqualified opinion privilege would disrupt the delicate balance between the constitutional need for vigorous public debate and the legitimate state interests in protecting personal reputations.

[W]e think the "'breathing space'" which "'freedoms of expression require

in order to survive,'" [*Philadelphia Newspapers, Inc. v.*] *Hepps*, 475 U.S. [767] at 772, 106 S.Ct. [1558] at 1561 [89 L.Ed.2d 783 (1986)] (quoting *New York Times* [*Co. v. Sullivan*], 376 U.S. [254], at 272, 84 S.Ct. [710], at 721 [11 L.Ed.2d 686 (1964)]), is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between "opinion" and fact.

*Id.* at 2706.[6]

The Supreme Court also reasoned that a wholesale exception for opinions would ignore the fact that "expressions of 'opinion' may often imply an assertion of objective fact,'" *id.* at 2705, and gave the following example:

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 2705–06.

The Supreme Court's emphasis on whether a statement implies a false fact when criticizing an individual indicates that there is a significant difference between (1) criticizing an individual's actions, and (2) falsely reporting an individual's actions. The former is constitutionally protected speech, the latter is not. "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's

---

6. The Utah Supreme Court has echoed the same thought:

The need to provide the media with a margin for error is most clear and compelling in cases involving public officials and public figures. The requirement of actual malice in the constitutional sense provides that margin for error which *permits the freest flow of information likely to be of importance in deciding*

*matters of public import, without extinguishing all protection for reputational interests.* Seegmiller v. KSL, Inc., 626 P.2d 968, 973 (Utah 1981) (emphasis added). *See also Cox v. Hatch*, 761 P.2d 556, 559 (Utah 1988) (Free speech does not "always prevail against all other values, such as those protected by the state law of defamation.").

interest in 'uninhibited, robust, and wide-open debate on public issues.' " *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007.

■ The Supreme Court's test in *Milkovich* for whether a statement, or the connotation of a statement, is actionable is quite simple: it is actionable if the statement is "sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 110 S.Ct. at 2707. In applying the *Milkovich* test to the present case, we must determine whether the connotation that West opposed municipal power in order to be elected was sufficiently factual to be susceptible of being proven false.

Guldan's criticism of West is unequivocally based on the implied factual assertion that West opposed municipal power before the election. Applying the Supreme Court's reasoning from *Milkovich*, we conclude that if the underlying factual assertion that West opposed municipal power prior to the election is false, then the assertion that he opposed municipal power prior to the election *in order to get elected* must also be false.

The trial court erroneously reasoned that since only West could truly know his position before the election, Guldan's report of his change in position could not be proven true or false.[7] The trial court failed to recognize that it is West's public position, not his private view, that is at issue. West's public position is an objectively verifiable fact. At trial, West may present his evidence to show his public support of the project; defendants may then present their evidence to prove his public opposition to municipal power. The jury must then determine whether West supported or opposed municipal power prior to the election.

West presented to the trial court a group of letters which had been sent to all citizens of La Verkin prior to the election. The main letter weighed the pros and cons of municipal power and concluded: "With all this in mind and after studying the many good arguments on both sides of the issue ... we feel that we should purchase the power system." The letter is signed by Mayor West along with several other members of the city council who supported the purchase. (Letters were also included in the packet from council members who opposed municipal power.) The trial court ruled that the pro municipal power letter was insufficient to raise a question as to whether West in fact opposed municipal power before the election. Such a conclusion was incorrect. The letter clearly indicates that West was taking a pro-municipal power position before the election. The letter therefore creates a material question of fact as to West's pre-election position.

We conclude that the trial court erred in ruling that the connotations of Guldan's comments were not factual enough to be susceptible of being proven as true or false. Either West did, or he did not, publicly oppose municipal power prior to the election. If he did not oppose municipal power, then it cannot truthfully be said that he opposed it for political gain. If a jury finds that West publicly opposed municipal power prior to the election, West will have failed to prove that the statements were in fact false and his libel claim will fail. If, on the other hand, a jury concludes that West publicly and consistently supported municipal power prior to the election, then any connotation in Guldan's articles that he opposed municipal power in order to get elected would, as a matter of logic, be proven false.

■ Since it is possible for the connotation of Guldan's articles to be proven false by proving the underlying factual assertion false, we hold that Guldan's articles are actionable. The trial court therefore erred in granting summary judgment. Even though we reverse the summary judgment because Guldan's articles were not absolutely privileged as "opinion," we empha-

---

7. The trial court ruled that Guldan's comments were his "interpretation" of the pre-election position of the Mayor and were therefore "opinion." Such a conclusion is directly contrary to Guldan's own portrayal in his second article of his earlier statements.

In my last column, I addressed areas of concern I had about the Mayor's actions. I believe I addressed them in a singularly unopinionated format. All I have done is presented the facts which were available to me, and left any conclusions to the reader.

size that they are protected under the Supreme Court's traditional First Amendment analysis. West must therefore still prove on remand that Guldan acted with actual malice.

### Actual Malice

■ The trial court granted summary judgment to defendants Hogun and Goodey because it concluded that no jury could find that they published the Guldan articles with "actual malice." The constitutional requirement of "actual malice" requires that the plaintiff prove that the publisher of the statement either knew the statement was false or had a reckless disregard for the truth of the statement. *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

■ As to Guldan's first article, West asserts that the failure of Hogun and Goodey to investigate its accuracy prior to publication evidenced a reckless disregard for the truth. Hogun and Goodey assert that they had no duty to investigate before publishing because it was permissible for them to accept Guldan's article as true. Whether Hogun and Goodey had a duty to investigate the accuracy of Guldan's article is determined by their subjective mindsets in publishing.

> [The] cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publications. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

West had the burden to produce evidence showing that Hogun and Goodey had "serious doubts" as to the accuracy of Guldan's articles. After reviewing the record, we are unconvinced that West ever made such a showing as to the first article. Hogun never read the first article before publishing and Goodey indicated that he had no reason to doubt the accuracy of the article. West offered no evidence to contradict their claims. We therefore affirm the granting of summary judgment in favor of Hogun and Goodey regarding Guldan's first article.

■ We reverse, however, as to the second article. West claims that circumstantial evidence proves that Hogun and Goodey had "serious doubts" as to the truth of Guldan's second article. West argues that once he informed Hogun of the inaccuracies in the first article and provided him a copy of his pre-election letter showing his support of municipal power, and once Hogun informed Goodey of West's complaints, Hogun and Goodey would have had serious doubts.[8] Defendants maintain that such circumstantial evidence is insufficient to prove actual malice. We disagree.

> The subjective determination of whether [a defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts. A court typically will infer actual malice from objective facts. These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.

*Bose Corp. v. Consumers Union of United States*, 692 F.2d 189, 196 (1st Cir.1982) (citations omitted) *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

Hogun contends that the following undisputed facts demand summary judgment because they negate any reasonable likelihood that a jury could find that he acted with actual malice. First, Hogun did not review the second article. Second, Hogun consulted his managing editor and outside legal counsel. Finally, based on advice of legal counsel, Hogun (a) caused a retrac-

---

**8.** *Cf. Curtis Publishing Co. v. Butts*, 388 U.S. 130, 157–58, 87 S.Ct. 1975, 1992–93, 18 L.Ed.2d 1094 (1967) (article was published with little initial investigatory effort and after plaintiff had notified defendant that story was inaccurate).

tion of the insurance statement because counsel advised that it was the only false factual statement, (b) caused West's letter refuting Guldan's initial accusations to be published, (c) undertook no further investigation of the matter, and (d) instructed legal counsel and managing editor to review Guldan's second article before publication.

Hogun's assertion that the foregoing facts demand summary judgment is erroneous. While they might be persuasive to a jury, they do not support a motion for summary judgment because they do not *foreclose* the possibility that a jury might find actual malice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (moving party must "foreclose [ ] the possibility of the existence of certain facts" from which the jury could infer a conspiracy)).

West asserts that alternative inferences arising from the same evidence tend to show that Hogun entertained serious doubts. For example: Hogun would not have consulted legal counsel if he did not have serious doubts; Hogun's knowledge that the insurance story was inaccurate would cause him to doubt the accuracy of the rest of the article; Hogun would have stood by the first article without publishing West's rebuttal letter if Hogun did not have serious doubts; Hogun's failure to investigate further or review the second article was an attempt to protect himself from suit; Hogun instructed his legal counsel and managing editor to review the second article because he had serious doubts about what Guldan might write given the inaccuracies in the first article.

West also asserts that Hogun's investigation and retraction of the insurance story due to legal advice that it was the only actionable statement shows a reckless disregard for truth. According to West, Hogun only did what was necessary to avoid legal action, while disregarding the truth or falsity of the other statements. West also points to Hogun's failure to cause his pre-election letter to the citizens to be mentioned in the second article as a deliberate attempt to avoid any indication that the initial article was erroneous. The foregoing inferences, while clearly debatable, appear reasonable and therefore create a disputed question of fact.

Goodey similarly asserts that the following facts negate the possibility that a jury would find that he acted with actual malice: (1) Goodey believed, based on his own editorial judgment and the advice of legal counsel, that Guldan's article merely reflected Guldan's opinion; (2) based on legal advice, Goodey believed that the appropriate response was to print West's letter containing his "opinions," let Guldan respond with his "opinions," and let the readers draw their own conclusions; and (3) based on legal advice, Goodey made no further investigation.

■■■ Once again, the foregoing facts do not preclude a jury from finding actual malice. They are simply persuasive of Goodey's position. Whether or not Goodey thought the statements were legally protected opinion, and whether Goodey thought that the appropriate response would be to publish West's letter and Guldan's response, are immaterial facts in determining whether he had serious doubts as to the statements' actual truth. Also, whether Goodey relied on the advice of legal counsel in deciding not to investigate further is immaterial to the question of whether he personally had serious doubts as to the accuracy of Guldan's accusations.[9]

West asserts that Goodey must have had serious doubts about the accuracy of Guldan's report once he learned that Phil Phillips was the source of the municipal power

---

9. We reject any argument that reliance upon legal counsel somehow shields a defendant from a defamation suit. Reliance upon legal counsel simply does not figure into the constitutional formula created by the Supreme Court. The proper focus is on a defendant's efforts to publish the truth, not the defendant's efforts to avoid legal liability. One's reliance upon legal advice as to what course of action should be followed to avoid legal consequences, simply does not prevent a plaintiff from proving that the publisher had "serious doubts" about the statement when it was published.

statements. As Goodey himself wrote in the third article, Phillips was West's "political enemy." Goodey himself accused Phillips of repeated attempts to manipulate the press, and of trying to "nail" Mayor West based on "unsubstantiated comments." West argues that Goodey must have known Phillips was an unreliable source and that further investigation was necessary.[10]

Viewing the accumulation of circumstantial evidence and the possible inferences in favor of West, we conclude that Hogun and Goodey were not entitled to summary judgment as a matter of law.[11] Hogun and Goodey did not foreclose the possibility of a jury finding that they acted with actual malice. They presented evidence which could support a jury's finding in their favor, but the evidence does not mandate such a finding. Whether or not Hogun and Goodey had actual malice in allowing the publication of the municipal power statements in the second article therefore remains a material disputed fact and summary judgment was improper.

### Manipulation of the Press

The third article in this case, "How I came to 'love' La Verkin's mayor," was written by Goodey. He discussed the ongoing political conflict between Mayor West and Phil Phillips, the chairman of La Verkin's planning commission. Goodey wrote: "The problem I have with the two gentlemen is their repeated, and not too subtle attempts to manipulate the press." Goodey then recounted several attempts by West and Phillips to get their versions of La Verkin politics printed. The article also related how each accused the newspaper of covering up the errors of the other.

The trial court granted defendants' motion to dismiss all claims relating to the third article because it found that the statements were not, as a matter of law, libelous. Libel is defined in Utah Code Ann. § 45-2-2(1) (1988) as follows:

"Libel" means a malicious defamation, expressed either by printing or by signs or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby expose him to public hatred, contempt or ridicule.

---

**10.** "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. *See, e.g., Curtis Publishing Co.,* 388 U.S. at 157–58, 87 S.Ct. at 1992–93 (defamatory matter, which was not "hot news," from suspect source was printed without substantial independent support); *Stevens v. Sun Publishing Co.,* 270 S.C. 65, 240 S.E.2d 812, 815 *cert. denied,* 436 U.S. 945, 98 S.Ct. 2847, 56 L.Ed.2d 786 (1978) (author published article after being told that the information provided by informant, the respondent's former sister-in-law, was "biased, unreliable, and untrue, and that the publication of the article would damage respondent").

**11.** Defendants urge this Court to depart from our traditional summary judgment analysis when free speech is involved. They urge us to adopt the federal civil procedure requirement that a libel plaintiff produce "clear and convincing" evidence that the defendants acted with actual malice. *See Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. We decline defendants' invitation since the inconsistent analysis set forth in *Anderson* requires trial courts to weigh the evidence while at the same time prohibiting a weighing of the evidence. *See id.* at 265–66, 106

S.Ct. at 2519 (Brennan, J. dissenting). We also decline to provide special procedural requirements for libel defendants in addition to the substantive constitutional protections. *See id.* at 268–69, 106 S.Ct. at 2520–21 (Rehnquist, J. dissenting). Contrary to the dissent's assertion, the Utah Supreme Court did not approve the *Anderson* analysis in *Cox,* 761 P.2d at 561. The supreme court acknowledged the preference for resolving defamation claims on the pleadings where appropriate, as indicated in *Anderson,* and then stated, "[n]evertheless, it would be inappropriate to dismiss the defamation claim on the grounds discussed above." *Id.* The standard of review analysis set forth in *Anderson* was never even discussed.

Even if we were to adopt the federal approach set forth in *Anderson,* it would not alter the result of this appeal. As the Supreme Court itself said, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, and "the plaintiff, to survive the defendant's motion, need only present evidence from which a jury *might* return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Id.* at 257, 106 S.Ct. at 2514 (emphasis added). Such a standard has been met here.

A trial court has a duty in a libel case to make a preliminary determination whether the communication could be considered defamatory.

> Whether the publication of an alleged defamatory statement ... is capable of conveying a defamatory message is initially a question of law.
>
> The tort of defamation protects only reputation. A publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff. Thus, an embarrassing, even though false, statement that does not damage one's reputation is not actionable as libel or slander. If no defamatory meaning can reasonably be inferred by reasonable persons from the communication, the action must be dismissed for failure to state a claim. Only if a court first determines that a publication might be considered defamatory by a reasonable person is there a fact issue for the trier of fact.

*Cox v. Hatch,* 761 P.2d 556, 561 (Utah 1988) (citations omitted).

The trial court concluded in the present case that "the charge of manipulation of the press could not possibly give rise to a defamatory meaning in the minds of reasonable jurors." We disagree. The term "manipulate" clearly has a possible negative connotation. One of its definitions is "to control, manage or play upon by artful, unfair or insidious means especially to one's own advantage." Webster's Third New International Dictionary (unabridged) 1376 (1986). "Manipulation" is defined as "management with use of unfair, scheming or underhanded methods especially for one's own advantage [ < swing the balance of political power ... by manipulation— Paul Blanshard > ] [ < manipulation is one of the dirtiest words in the new lexicon— W.H. Whyte > ]." *Id.*

Inherent in the accusation that West repeatedly attempted to manipulate the local press, and in the conduct reported, is the connotation that West did so in order to control the information disseminated to the public. While reasonable persons might debate whether such a connotation impeaches West's honesty, integrity, and reputation and whether it holds him up to public hatred, ridicule, or contempt, the possibility of the debate requires a ruling in West's favor.[12] Since it is debatable whether the accusation was defamatory, we must draw the inference in West's favor and conclude that a reasonable juror might consider the accusation defamatory. *See Cox,* 761 P.2d at 561. We therefore hold that Goodey's article is actionable as libelous and the trial court erred in granting defendants' motion to dismiss.[13]

## CONCLUSION

With regard to defendant Guldan: The summary judgment as it relates to the municipal power statements made in both the first and second articles is reversed and remanded.

With regard to defendants Hogun and Goodey: The summary judgment as it relates to the first article is affirmed; the summary judgment as it relates to the municipal power statements made in the second article, however, is reversed and remanded; the dismissal of the cause of action arising from the third article regarding

---

**12.** The dissent asserts that it is a "mainstream public expectation" that politicians would attempt to manipulate the press. We do not share such a cynical opinion. Nevertheless, the point is that it is the duty of the jury to determine, given the political climate and the totality of the circumstances in their community, whether the accusation of manipulating their local press in fact held West up to public hatred, ridicule, or contempt in their community. Only the jury can make such a determination and we are not justified in removing it from them based on our own personal views and expectations of politicians.

**13.** In holding that such statements may be found to be defamatory by a jury, we do not imply that West must prevail on remand. We are only holding that the legal threshold of defamation has been crossed and whether or not the statements are in fact defamatory must be decided at trial. The defenses that may be raised by defendants, such as truth and the absence of actual malice, are also questions of fact that remain to be determined at trial.

manipulation of the press is also reversed and remanded.

JACKSON, J., concurs.

GARFF, Judge (dissenting):

I dissent. I would not reach either the state or federal constitutional issues, but would affirm the judgment on the ground that the statements are not defamatory as a matter of law because they do not "impeach [West's] honesty, integrity, virtue, or reputation or publish his ... natural defects or expose him ... to public hatred, contempt, or ridicule." *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988); Utah Code Ann. § 45–2–2(1) (1988).

"Whether the publication of an alleged defamatory statement ... is capable of conveying a defamatory message is initially a question of law." *Cox*, 761 P.2d at 561. Thus a trial court's first task is to determine whether, as a matter of law, a statement was capable of conveying a defamatory message. *Id.* On appeal, we review independently this initial legal determination.

*Cox* is directly on point. Similar to the present case, the plaintiffs in *Cox* appealed a dismissal of their defamation claim. The alleged defamatory statement was a photograph published in Orrin Hatch's campaign literature during his 1982 campaign for reelection to the United States Senate. Plaintiffs were employees of the United States Postal Service and were members of the American Postal Workers Union. The photo portrayed Hatch talking to plaintiffs at their place of employment. The photo was included in an eight-page political flier entitled "Senator Orrin Hatch Labor Letter," distributed by Hatch's "Union Members for Hatch Committee." Plaintiffs allege the photo defamed them because it implied they endorsed Hatch for reelection and that they were Republicans.

The Utah Supreme Court affirmed the dismissal in part because the implications that plaintiffs were Republican or that they supported Hatch were not defamatory as a matter of law. *Id.* at 562. The court held that "attribution of membership in a political party in the United States that is a mainstream party and not at odds with the fundamental social order is not defamatory." *Id.* The court further held that "attribution of support for a candidate from one of those parties" is not defamatory. *Id; see also, Frinzi v. Hanson*, 30 Wis.2d 271, 140 N.W.2d 259, 262 (1966) ("Being charged with being a good, luke warm or nonmember of a political party is not libelous."). The court in *Cox* concluded:

> However offensive the photograph in this case may have been to the plaintiffs, it could not, as a matter of law, have damaged their reputations or subjected them to "public hatred, contempt or ridicule." In sum, the complaint failed to state a claim for relief based on defamation.

*Cox*, 761 P.2d at 562.

*Cox* noted, with approval, other cases which held that statements regarding political positions or affiliations were not defamatory as a matter of law. *Id.* at 562; *see, e.g., Frinzi*, 140 N.W.2d at 262 (accusation by Democratic Party Chair that Democratic candidate was endorsed by certain Republicans who supported weakening anti-gambling laws, and that candidate considered running as an Independent not defamatory as a matter of law); *Rawlins v. McKee*, 327 S.W.2d 633, 635 (Tex.Civ.App. 1959) (per curiam) (accusation that political candidate was radical who was financed by labor bosses not defamatory as a matter of law); *Manasco v. Walley*, 216 Miss. 614, 63 So.2d 91, 95 (1953) (statement that candidate for reelection to the house lost funding for state roads by removing them from priority list not defamatory as a matter of law).

Other cases have likewise held that accusations alleging mainstream political positions or activities are not defamatory as a matter of law. *See, e.g., Exner v. American Medical Ass'n*, 12 Wash.App. 215, 529 P.2d 863, 867 (1974) (fluoridation); *Shields v. Booles*, 238 Ky. 673, 38 S.W.2d 677, 681 (1931) (pro parimutuel law).

Here, the trial court concluded the articles were capable of conveying the mes-

sage that West was "a liar and the worst kind of political cheat." This conclusion greatly exaggerates the import of the statements and is erroneous as a matter of law.

Municipal power is clearly a matter of public concern. "Communications to voters by an elected official ... which appropriately pertain to a political campaign are a matter of public interest." *Cox,* 761 P.2d at 560. The statements regarding West's position on municipal power do not directly imply West intended to deceive voters, nor do they imply he lied about his prior position. The statements say only that his position changed after the election. Moreover, any position, or change of position, regarding municipal power is a mainstream political position and not "at odds with the fundamental social order." *Id.* at 562. Thus, the statements are not defamatory as a matter of law.

Neither is the accusation that West attempted to manipulate the press defamatory as a matter of law. The trial court correctly concluded that "the charge of manipulation of the press could not possibly give rise to a defamatory meaning in the minds of reasonable jurors."

The majority claims the statement is actionable because there exists a "possibility of the debate" that an accusation of manipulation is defamatory. The majority, relying on a secondary definition in Webster's, found the sentence actionable because one of the many definitions of the word "manipulate" has a negative connotation.

I disagree with this analysis. First, the same edition of Webster's provides other, preferential definitions of the word: "handle or manage esp. with skill or dexterity," "to treat or manage with the mind or intellect," "to control the action or course of by management: utilize by controlling and managing." Webster's Third New International Dictionary (unabridged) 1376 (1986).

More importantly, the notion that West exercised power over the press is not, as a matter of law, defamatory. The accusation that a political leader or a political candidate would attempt to manage or to exercise influence over the press is a main-

stream, public expectation and, again, is "not at odds with the fundamental social order," and thus is not defamatory. *Cox,* 761 P.2d at 562.

Courts have concluded that even stronger words used against political leaders and candidates are not actionable as a matter of law. *See, e.g., Miskovsky v. Oklahoma Pub. Co.,* 654 P.2d 587, 594 (Okla.) ("scurrilous defamation" and "gutter theatrics" not actionable), *cert. denied,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186, *reh'g denied,* 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 625 (1982); *Good Gov't Group v. Superior Court,* 22 Cal.3d 672, 150 Cal.Rptr. 258, 262, 586 P.2d 572, 576 ("recalcitrant," "machinations," "infamy" and so forth used against former city council member not actionable), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1978).

I also dissent to the majority's rejection, in note 11 of its opinion, of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Anderson* held that, in cases of summary dispositions involving libel, the plaintiff must produce clear and convincing evidence that the defendants acted with actual malice. *Anderson,* 477 U.S. at 252–54, 106 S.Ct. at 2512–13. This approach was acknowledged approvingly by the Utah Supreme Court in *Cox,* 761 P.2d at 561. The *Cox* court acknowledged "a First Amendment interest in disposing of libel cases on motion and at an early stage when it appears that a reasonable jury could not find for the plaintiffs." *Id.*

In conclusion, I would affirm the trial court's summary judgment and dismissal on the ground that the statements are not defamatory as a matter of law, pursuant to Utah Code Ann. § 45–2–2(1).